DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Ottawa County Court of Common Pleas, Juvenile Division, which awarded temporary custody of three children to their paternal grandfather. Because we conclude that the evidence supported the trial court's findings, we affirm. *Page 2 
 {¶ 2} Appellant, Jerry V. ("father"), is the biological father of Kristen V., Autumn V., and Carley V., and the stepfather of Brianna G., whose birth mother is father's wife, Stacey V. On April 19, 2007, Ottawa County Department of Job and Family Services ("OCDJFS") filed a complaint alleging that Kristen, then age 13, Autumn, age 12, and Carley, age 9, were abused and dependent children. Brianna, then also age 12, was alleged to be a dependent child in a separate complaint. The allegations stemmed from incidents involving alleged physical abuse of Kristen by her father and emotional abuse by father and stepmother. Reports of abuse made by two schools and a court employee resulted in a charge of domestic violence against father. Consequently, Kristen, Autumn, and Carley were removed from the household on a temporary emergency basis, and placed with their paternal grandfather.
 {¶ 3} The court conducted an adjudication hearing on May 14, 2007, regarding all four children. Kristen testified that on April 1, 2007, her father took her into her bedroom by herself, and disciplined her by hitting her on the buttocks many times with a rubber "car part." She said he instructed her to bend over the bed before striking her. After hitting her on the buttocks, he then allegedly put her on a bunk bed and struck her several more times across the chest area. Kristen stated that the punishment was for taking food from the kitchen without permission and for having candy wrappers and a dirty cereal bowl under her bed.
 {¶ 4} Kristen said the next morning, she took the car part from where her father kept it in the house, took it to school, and reported the incident to her school counselor. *Page 3 
She said that other incidents of corporal punishment had occurred before this, but that she reported this time because she had "had enough" and was afraid to go home.
 {¶ 5} The school counselor testified that, the morning after the incident, Kristen came to her office as soon as she was at school. The counselor described Kristen as usually being very "even" in demeanor. That morning, the counselor said she "knew something was wrong the minute I saw her" and that Kristen was very upset. The counselor stated that Kristen told her about being hit with the car part by her father, which she had brought to school and placed in her locker. Kristen confirmed that there were marks left by the alleged beating. The counselor contacted children services at OCDJFS and continued to talk with Kristen about what had happened. The counselor also noted that Kristen had not been a discipline problem at school and received A, B, and C grades, averaging about a B.
 {¶ 6} Officer Ralph Edmonds, a Port Clinton police officer, met Amy Woody, an OCDJFS caseworker, at Kristen's school after the school counselor reported the suspected abuse. Kristen related the incident to Officer Edmonds, who then made a police report. He also took into evidence the black rubber car part that Kristen had brought to school. He stated that the part was a "black rubber thing and had a handle and a round part on top." The officer said that Kristen appeared to be upset and angry about the incident. She told him that her father had hit her with the car part 15 to 20 times on the "butt" and eight to ten on the chest. He also said that Kristen ultimately made a written statement which was consistent with what she had told him verbally. *Page 4 
 {¶ 7} The officer then identified state's Exhibit 1 as the part he had taken into custody. He stated that, based on the report, he had other officers pick up Jerry V., Kristen's father, to place him under arrest and to question him. Jerry told the officers that Kristen had stolen a cell phone from her grandmother, lied about it, and that he had "swatted her on the butt" with his hand for stealing and lying about the phone. He said that the car part was actually a gas pedal cover to an old car he owned. He could not explain Kristen's bruises or how the marks left on her chest area matched the grooves from the car part.
 {¶ 8} B.J. Surovjak, a counselor with the Intervention Court FACT (Families and Court Together) program then testified that she had met Kristen, her father, and her stepmother during Kristen's attendance in the FACT program. Kristen had been placed in the program in December 2006, after her parents had filed "unruly" charges against her. As a result of information revealed at counseling sessions, Surovjak had expressed concern to the parents about the methods of discipline being employed by father and stepmother. The counselor determined that problems also existed with the parents, and the whole family needed counseling. Surovjak noted that during a follow-up visit at school, Kristen appeared happy and relaxed, unlike her demeanor when she was with her parents at the FACT sessions.
 {¶ 9} Surovjak testified that she had been called by the school and went there to talk with Kristen on the morning that the abuse report had been made. Kristen said she had been beaten for stealing food and showed the counselor the rubber object that she had *Page 5 
placed in her locker. The counselor also described Kristen as not crying, but being very upset and terrified to go home. She believed that because Kristen felt safe while in the school setting, she had been very open with her about the incidents in the home.
 {¶ 10} When Surovjak later talked with father and stepmother after the abuse charges were filed, they appeared very angry. Father admitted that he had hit Kristen but not with any object. Father and stepmother claimed that she "stole food from the kitchen." The counselor then questioned them how family members could steal food from each other or the household in general. Stacey told her that the children were not allowed to eat anything unless she gives them permission to eat it. She said that she found food wrappers and bowls under the bed, which is what caused the beating. Surovjak said that father stated that he would not allow Kristen back in his home. After discussions with the parents, Surovjak remained concerned about placement for all the children because Kristen had been very nervous and feared being beaten again if she went home. She further noted that she had never known Kristen to lie to her during the counseling sessions.
 {¶ 11} Amy Woody, OCDJFS caseworker, then testified that her first contact with Kristen and the family was on April 2, 2007, the day that the abuse complaint was reported. She said she had also gone to the child's home with her father in December 2006, as a result of a referral when the children disclosed in counseling that they were being hit with boards. When she spoke with the children, they told her they had changed *Page 6 
their minds and that they had lied because Brianna missed seeing her father and Autumn missed her mother.
 {¶ 12} When the caseworker talked with Kristen after the April incident, Kristen said that on the day before, she and her sisters had just returned from their mother's home, where they had spent the weekend. Kristen related what had happened. Woody stated that she observed some swelling and slight bruising on Kristen's cheek bone area under the eye. When Kristen lifted her shirt, the caseworker observed circular marks and purplish bruising on Kristen's chest area near her breast. Woody also saw "bruising across both butt cheeks, a little bit onto the hips." One bruise on the buttock area appeared as a rectangular pattern. Those photos were admitted into evidence. The caseworker documented the bruises and other marks by photographs, which were admitted into evidence. Kristen also retrieved the car part from her locker and gave it to the caseworker.
 {¶ 13} Kristen again related the incident, stating that her stepmother and three sisters were also at home at the time. Woody also noted that although Kristen did not appear to be highly upset, Kristen was afraid that things would get out of hand and she might end up being killed. She told the caseworker that she had "had enough." Woody said that, although Kristen was a "tough cookie," she was visibly upset and feared going home.
 {¶ 14} Woody said that she then went to the police station to meet with father. He was cooperative, stating that he had spanked Kristen only with his hand. He said he did *Page 7 
not know who would have hit her with the car part, which was from a 1957 Chevy he owned. The caseworker asked to interview Stacey, the stepmother, but could not because both parents were instructed by their attorney not to talk to the caseworker without an attorney present.
 {¶ 15} Woody stated that two weeks later she also spoke with then 12 year old Brianna at school on April 17, 2007. Brianna said she was "petrified" to go home, and begged the caseworkers not to send her back home that night. Woody said Brianna was very emotional, crying, shaking, and gasping for breath. Brianna said that all the children had been threatened in the past that if they ever made another report of abuse that they would be killed and taken out into the woods or some other remote place where they would never be found, buried, and then reported missing. Brianna said that her mother and stepfather threatened to kill her numerous times, and that it was an ongoing threat. The caseworker observed that Brianna had dark circles under her eyes and looked worn out. Brianna said she was not getting sleep because of recurring nightmares about her parents, Stacey and Jerry, killing her or beating her.
 {¶ 16} Brianna also said that the parents had used a whip "with strings" and a board, which was still by the couch. She said that she had not been hit recently because of the newest allegations with Kristen, but that she was more fearful now that she was alone after the other girls' removal. Brianna also described a game that they had to play at their previous residence, in which the children had to pick a board (to be paddled with), roll dice, and then add up the numbers on the dice to determine how many "whacks" they *Page 8 
would get. Brianna also stated that sometimes they would only get only a sandwich for dinner, and if they later tried to get a snack, they were accused of stealing food and disciplined.
 {¶ 17} Woody also talked with Autumn and Carley, after they had been temporarily placed with their grandfather. Autumn, then 12 years old, said she had not seen Kristen being hit, but did hear screams from the bedroom. She also described boards for the paddling, one which broke and the parents had used duct tape and electrical tape to put it back together. After it broke again, Autumn said the parents cut up two by fours to use to spank them. She also remembered the dice game and described the whip, which was 12 inches long with fringes, as belonging to stepmother, Stacey. Autumn also said, "I lied to you the last time you were out to see us," in reference to when the girls had changed their story about the abuse in December 2006. Autumn said that they had changed their story because Stacey and her father had threatened them. Autumn also said that the parents said that if the girls ever "told again or made another report," they would kill the girls, take them where no one could find them, and then report them as missing persons.
 {¶ 18} Woody then spoke with Carley, then nine years old, who appeared cautious but promised to tell the truth. Carley said that, on the day of the hitting incident, Stacey had told her to clean out the bedroom and when she was throwing out the wrappers and cereal left in the bowls, Stacey had told Jerry to "take care of Kristen. She and Autumn were told to go into the living room, where they heard Kristen screaming in the bedroom. *Page 9 
Stacey told Carley to go in and tell Jerry to shut the window and the door, which she did. Carley said she then heard more screaming. She said that shortly afterward, Kristen showed her the marks on her chest area.
 {¶ 19} Carley described being disciplined by being whacked with a board on her palms, which swelled. Carley also indicated that she feared going back home because she would be in trouble for telling about the abuse. She related the same threat about being killed and buried in the woods by her parents.
 {¶ 20} Autumn also testified as to the events on the day of the incident with Kristen. She confirmed that Kristen was disciplined after Stacey found candy wrappers under her bed. She said that she heard Kristen screaming in the bedroom and Kristen told her that father had hit her with "this car brake thing." She had seen it before and, at one time, it was kept in their closet. Autumn said she did not remember telling the caseworker about the incident, but did tell her about the dice game and the parents' threats to take the girls into the woods where no one could find them. She said that when she had previously lived with her mother, and father wanted her to live with him, he had promised that "none of this would happen again, and then it did." She said she was scared about the threats to be left in the woods, and was afraid to go back home because of the broken promise about not spanking the girls.
 {¶ 21} Autumn also said that she was upset by a recent phone conversation with father in which he asked her to testify that "none of this stuff happened." She said she told her father "yes," but then told her grandfather about the conversation. In another *Page 10 
conversation, Autumn said that when the caseworker came to see her about an incident reported by Brianna, Autumn was supposed "to lie, because everyone else was going to say that they made it up." She said her dad asked her, "Why do you stab me in the back * * *?" Autumn said she then did lie to the caseworker, because she was afraid of her father.
 {¶ 22} Carley also testified that, on the day of the incident, her father took Kristen into their bedroom and she had begun screaming "really, really loud." After her father came out, Carley was instructed to finish cleaning the bedroom. Carley said that Kristen was still crying and had showed her "welts" and bruises on her chest area. She said that for discipline, she is grounded or spanked with a board. She then described the paddle as "this thing with a handle curved into it so you can like grip it and it has duct tape and electrical tape around it." She remembered telling Amy Woody, the caseworker, about being disciplined and the dice game, which she then described in court. Carley also corroborated that when the girls had told their mother about the dice game, Stacey and their father threatened them. They said that if the girls ever told anyone again, they would be killed and left in the woods where no one would find them.
 {¶ 23} Carley also expressed fear of going home because she might get hit with the board again. She said that, in the past, she had had bruises and marks from being hit with the board. She said she had never told anyone before, but did not know why. Carley said she had seen her sisters get "disciplined" also. *Page 11 
 {¶ 24} Michelle Christie, the guardian ad litem ("GAL"), then testified that she had done an extensive investigation and had spoken with all the children except Brianna. She noted that Kristen, Autumn, and Carley were all "very consistent in what they told [her] happened." The most consistent issue was that all three were afraid to go back to live with their father and stepmother. Kristen was adamant that she "wanted nothing to do with her father." The GAL spoke with Kristen's guidance counselor who reported that Kristen is much more relaxed and her demeanor greatly improved now that she is living with grandfather. Kristen's school work had improved and she "seems to be a completely different girl right now."
 {¶ 25} The GAL stated that all three girls were happy and felt safe living with their paternal grandfather and wanted to maintain the relationship with mother. They all also expressed fear of returning to the father's home. The GAL stated that she recommended that the children remain in the custody of their grandfather, until final disposition was made.
 {¶ 26} The next witness, Jenny Dornbusch, the CASA representative for the girls, had been appointed just three days prior to trial. She testified that she had spoken twice to Kristen, Autumn, and Carley and once with Brianna. She stated that she thought Kristen was being truthful, and that Kristen expressed relief that, after her testimony, everything is now out in the open and being addressed. Kristen told her she is fearful and does not want to return to her father's home. She would like to live either with her mother or remain with her grandfather. Autumn expressed the same fears of going to *Page 12 
father's home, and desired to live with grandfather. Carley feared going to father's, would rather be with mother, but was happy with her grandfather. Dornbusch said she also spoke with Brianna, who related that she never wants to live with her mother again. According to the CAS A, now that she was with her grandmother, Brianna was "happy and so jubilant," saying, "I am free. I am free. I am out of prison." Brianna stated that she loves living where she is, and that it was "wonderful." During the visit, the phone rang several times. The CASA observed that when Brianna saw that it was her mother on the caller I.D., she became very fearful, tense and nervous. Unlike the other girls, Brianna also volunteered to tell her about the dice game, and said, "We eat our food and they call it stealing." She also described the various paddles used and said that Kristen "got it" a little worse than the rest.
 {¶ 27} The CASA said she had not had the opportunity to speak with the parents, but planned on doing so. She stated that, based on her experience talking with children and the consistency of all the girls' statements, she had no doubts that they were telling the truth. The CASA also believed that the children should "definitely not return" to the father's home at that time.
 {¶ 28} Lynn O'Neal, Brianna's school guidance counselor, testified that Brianna had told her in December 2006, about incidents involving being paddled with a board and other incidents in April 2007. O'Neal said she contacted Children Services each time. After the April incident when her sisters were removed from the home, Brianna's demeanor dramatically changed. Brianna sought out the counselor more frequently, *Page 13 
asking to stay at school because she feared going home. She told the counselor about threats made to her and the sisters by her stepfather about leaving them in the woods where no one could find them and filing a missing person report. Brianna told the counselor that her mother had said she would rather kill her than give her to someone else.
 {¶ 29} O'Neal said she met with mother about an incident that occurred during school recess, but otherwise had not expressed concerns to the mother. The counselor said she had concerns about Brianna returning to live with mother and stepfather's home. In her experience as a counselor, O'Neal said that children often have symptoms of sickness when troubled by something else. She said Brianna would be stressed and become physically ill, often complaining of headaches and stomachaches, when expressing fear and worry about going home. In her opinion, Brianna was a truthful child and was not a discipline problem at school. Her teachers had also been very caring and concerned about wanting to be sure she was protected. The state then rested its case.
 {¶ 30} On behalf of the parents, Bill G., Stacey's father, then testified that at the time of the incident with Kristen, he had also been living at the home. He related that he did not have a permanent residence and would come to stay with his daughter and Jerry occasionally. He had been living with the family since December 2006, at the time of the incident. He testified that he believed Kristen had been disciplined that day for "raiding the refrigerator" and "some kind of phone situation." He confirmed that the children had to get permission before they ate any food, but did not know the reason for the rule. *Page 14 
 {¶ 31} Bill said that Jerry took Kristen into her bedroom for the discipline, and he heard "ear piercing" screaming. He and the others were in the living room. He said that when Kristen came out, she "plopped" down on the carpeting about five or six feet away. Since she was still being disciplined, she was required to sit on the floor and stare at the wall until released by the parents. He said he did not see any unusual marks on her. Bill said Stacey cut all the girls' hair, including Kristen's, and then they all went to bed. The next morning he said Kristen acted "uptight, kind of keeping to herself," and that she walked to school. He said that Kristen and Stacey did not have a good relationship, saying that Kristen is "violent toward Stacey and very unruly." He said he had observed this behavior only during the five months he had been staying with the family.
 {¶ 32} Although Bill thought it acceptable to spank a child, he agreed that if Kristen had been hit and had marks left, it would be wrong. He said he had witnessed Jerry spank his children, but had never seen him use a board or paddle.
 {¶ 33} Jerry V., the grandfather, then testified regarding his grandchildren, Kristen, Autumn, and Carley. He said that Kristen told him she hated Stacey and hated her father for choosing Stacey over his children. Grandfather also stated that the girls' mother often told them she was getting a swimming pool, and that they wanted to live with her. They also said, however, that if that was not possible, they wanted to stay with him. Grandfather also said he broke off a telephone conversation between Autumn and her father, when she became upset about what father was saying. He stated that he had not observed any type of discipline other than time-outs and taking away privileges. *Page 15 
Grandfather stated he found the girls, to be "good kids," respectful, responsible, and, including Brianna, generally truthful. He stated that he had never had a problem or found them to be unruly. Grandfather also stated that, although he loved his son, he would not lie to protect him. He then said that, although the girls might tell "stories" to get something they wanted, he did not believe they would lie in court.
 {¶ 34} Stacey V. then testified that Brianna was her biological child from a former relationship, and that she was stepmother to Kristen, Autumn, and Carley. She said that the relationship with her stepdaughters had been rocky, and during the past year had gone downhill. Stacey related that Kristen has said that she hates her and would say it daily. Stacey said that, on the day of the incident, she had been cleaning the girls' room when they returned home from the weekend visit with their mother. The family dog had brought out a candy wrapper, and she went into the room and removed the mattress and box springs from Kristen's bed. She said she and Jerry then cleaned up used cereal bowls, a can of raw refrigerator biscuits, and a bag of sugar. Stacey said the there was also a "bag and a half of jelly beans in the pillow case" on Kristen's pillow.
 {¶ 35} Stacey said that none of the girls are allowed to have food in their bedroom. She said that Kristen had also stolen a cell phone from their grandmother's friend. When confronted about the food and the phone, Kristen shrugged her shoulders and said she did not know why she had taken the phone and would not respond about the food. Stacey continued to confront her, and Kristen allegedly "smarted off and made a comment. Stacey then told Jerry to do something with her because she was getting frustrated. At *Page 16 
that point, Jerry told Kristen to go in the bedroom, and she heard Kristen scream "once or twice." Stacey said Kristen then came out and "flopped down on the floor" because she was mad and had gotten in trouble. She said she then cut the girls hair after their showers, including Kristen. Stacey said she did not see any marks on Kristen's chest area.
 {¶ 36} She said that three or four months before, that when the girls were bickering and fighting, Jerry had told them "If you don't stop, I am going to take you out in the woods and drop you off." She denied any other threats of violence were ever made. Stacey said that to discipline the children they use grounding or taking away things like their allowance, watching television, or using the phone. She said that when those things did not work, she and Jerry had started to "whip them." She acknowledged that both she and Jerry had spanked them with their hands. She said there had been boards in the previous home that had been used to spank the children, but those had been thrown away when they moved to the new house over a year before.
 {¶ 37} Stacey described one of the boards as having a grip handle, but denied that it had duct tape or electrical tape on it. She said they threatened with it at first, and then actually used it to spank them "once or twice." She said she had no knowledge of the dice game, claiming it was something the children had fabricated. She also denied that Carley had cleaned out from under the bed, even though all three girls stated this. She said she did tell Jerry, "go do something about your kid," because Kristen had "gotten mouthy" *Page 17 
with her. Stacey then further acknowledged that she would not have seen any marks on Kristen right after the spanking, because she had on a t-shirt and jeans.
 {¶ 38} Stacey also said Kristen had been diagnosed in February or March with oppositional defiant disorder and ADHD. She stated that she overheard the conversation between Jerry and Autumn, and denied that he had told her to lie about anything in the home. Stacey said that Jerry had told them to tell the truth when they went to court, not to lie. She dismissed Jerry's children's fear of returning home to their dislike of rules and that with their grandfather, they could do whatever they wanted. Stacey also dismissed the marks on Kristen's chest shown in a photo as a "rash" and did not see anything unusual in the photos showing horizontal bruising on Kristen's buttocks, except for also a "rash." She eventually said there was faint bruises on both sides, but it looked like "something old or something."
 {¶ 39} Stacey explained that Brianna, her own daughter, did not want to return home because she did not like being by herself since the other three girls had left. She also said that her daughter would lie for attention. Otherwise, Stacey said she had no idea why her daughter would have a fear of returning home. She also confirmed that all the children have to ask permission before getting anything from the refrigerator. Stacey stated that all the children lied often, to protect each other and themselves. She denied that any utility bills had ever been put in the children's names. She admitted that she herself had told a lie, but said she was telling the truth in court. The parents then rested their case. *Page 18 
 {¶ 40} The state then recalled Amy Woody, the caseworker, to testify regarding a phone account which had been opened in Brianna's name. Brianna had denied ever opening such an account, stating she would not even know how. Stacey then stipulated that there had been a telephone account opened in Brianna's name between August 2006 and February 2007, which was then in collection. The state then rested.
 {¶ 41} The court ultimately found the girls' testimony to be credible and determined Kristen to be an abused child, and Autumn, Carley, and Brianna to be dependent. At disposition, the parties all agreed to have the children remain in the temporary custody of the grandparents: Kristen, Autumn, and Carley with the paternal grandfather, and Brianna to remain in the custody of the maternal grandmother. A review hearing was to be held 60 days later to determine any further action, if necessary.
 {¶ 42} Appellant father now appeals from that judgment, arguing the following three assignments of error:
 {¶ 43} "I. The trial court committed prejudicial error in admitting evidence of the prior dependency proceeding involving father, in violation of Evidence Rule 404.
 {¶ 44} "II. The trial court committed prejudicial error in admitting hearsay testimony in violation of Evidence Rule 802.
 {¶ 45} "III. The trial court committed prejudicial error in adjudication appellant delinquent where the finding is against the manifest weight of the evidence." *Page 19 
 I. {¶ 46} In this first assignment of error, appellant contends that the trial court erred in admitting evidence regarding previous dependency proceedings involving him. Appellant claims the evidence regarding a previous dependency proceeding was inadmissible because it is not relevant to the events involving the incident with Kristen.
 {¶ 47} Evidentiary rulings and the overall conduct of a trial are generally within the discretion of the trial court. State v. Long
(1978), 53 Ohio St.2d 91, 98. Absent an abuse of discretion, such rulings of a trial court will not be found in error. O'Brien v.Angley (1980), 63 Ohio St.2d 159, 163. An abuse of discretion is more than an error of law or of judgment; rather, it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 48} The juvenile rules require that proceedings in dependency, neglect and abuse cases be bifurcated into separate adjudicatory and dispositional stages. In re Baby Girl Baxter (1985), 17 Ohio St.3d 229,233; In re Vickers Children (1983), 14 Ohio App.3d 201, 203-04. Strict adherence to the rules of evidence is required at the adjudicatory stage; hearsay evidence is inadmissible. Baxter, supra, at 233;Vickers, supra, at 206.
 {¶ 49} Evid. R. 404, which governs the admission of "bad acts" evidence, states: *Page 20 
 {¶ 50} "(B) Other crimes, wrongs or acts
 {¶ 51} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 52} In this case, although Kristen briefly talked about a previous involvement of the family in a dependency and neglect case, we note that the GAL also briefly referenced that prior proceeding, without objection by appellant. Ms. Christie, who had been the girls' GAL for the prior case as well, noted that the previous case was more of a custody dispute. At that time, Kristen, Autumn, and Carley were living with the same grandfather. Moreover, since the court itself was the trier of fact, it may be presumed that it only considered admissible, relevant evidence.
 {¶ 53} In addition, the evidence regarding the previous dependency proceeding provided evidence of intent to continue a pattern of behavior, or the absence of mistake or accident by father. Therefore, since the information was admitted without objection during the GAL's testimony and was not prejudicial, we cannot say that the trial court abused its discretion.
 {¶ 54} Accordingly, appellant's first assignment of error is not well-taken.
 II. {¶ 55} In this second assignment of error, appellant claims that the trial court committed prejudicial error in admitting hearsay testimony in violation of Evid. R. 802. *Page 21 
Specifically, appellant contends that the testimony by the school counselor relating to what Kristen said when she reported the alleged abuse was inadmissible hearsay.
 {¶ 56} As we noted previously, the admission or exclusion of evidence rests in the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, 180." Since an appellate court is limited to whether the trial court abused that discretion, it may not substitute its judgment for that of the trial court. See State v. Finnerty (1989),45 Ohio St.3d 104, 107-108.
 {¶ 57} Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid. R. 801(C); State v. Maurer (1984),15 Ohio St.3d 239, 262. Hearsay is generally not admissible except when considered an exception. See Evid. R. 803, 804, and 805.
 {¶ 58} Evid. R. 803(3) provides, in pertinent part:
 {¶ 59} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 {¶ 60} "* * *
 {¶ 61} "(3) Then existing, mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." *Page 22 
 {¶ 62} In this case, we note that Kristen testified as to what happened and that she had talked to her school counselor. Therefore, she was available for cross-examination as to those statements. In addition, the record indicates that the statements made by the counselor were not offered as to the truth of what happened, but rather to show evidence of Kristen's state of mind, emotion, and physical condition and the general consistency in her statements. The parents' primary defense was that Kristen was unaffected by the discipline and had lied about being hit with the car part. In our view, the counselor's testimony simply provided context from which the court could weigh the testimony of all the parties and determine credibility. Therefore, we cannot say that the trial court abused its discretion in admitting the counselor's testimony.
 {¶ 63} Accordingly, appellant's second assignment of error is not well-taken.
 III. {¶ 64} In his third assignment of error, father argues that the trial court's finding that appellant was "delinquent" is against the manifest weight of the evidence. Neither appellant nor any of the children in this case were found to be delinquent. Since the substance of appellant's argument relates to the "abuse" finding, we shall address the merits of that argument, rather than the actual assignment of error.[1] A trial court's adjudication of a child must be supported by clear and convincing evidence. *Page 23 
R.C. 2151.35(A). Clear and convincing evidence is that which produces "in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Thus, upon review, an appellate court must determine whether the trial court had sufficient evidence before it "to satisfy the requisite degree of proof." State v. Schiebel (1990),55 Ohio St.3d 71, 74; In re Alexander C, 164 Ohio App.3d 540,2005-Ohio-6134, ¶ 7.
 {¶ 65} Furthermore, judgments supported by "some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence."Seasons Coal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80, citingC.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus. In determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct. In re Brofford(1992), 83 Ohio App.3d 869, 876, citing Seasons Coal Co., supra. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co., at 80
 {¶ 66} R.C. 2151.031(C) defines an "abused" child as one who "[e]xhibits evidence of any physical or mental injury or death, inflicted other than by accidental means, or an injury or death which is at variance with the history given of it." Pursuant *Page 24 
to R.C. 2151.031(D), an "abused child" includes any child who, "[b]ecause of the acts of his parents, guardian, or custodian, suffers physical or mental injury that harms or threatens to harm the child's health or welfare." At adjudication to determine whether a child is an "abused child," the trial court need not find fault "on the part of a parent, guardian or custodian in order to conclude that the child is `abused' pursuant to the plain meaning of R.C. 2151.031." In rePitts (1987), 38 Ohio App.3d 1, 5.
 {¶ 67} Ohio law has recognized that parents have the right of restraint over their children and the duty to correct and punish them for misbehavior. In re Schuerman (1991), 74 Ohio App.3d 528, 531. However, such punishment must be reasonable and must not exceed the bounds of moderation and inflict cruel punishment. Id. See, also,State v. Liggett (1948), 84 Ohio App. 225. Corporal punishment that is excessive given the circumstances, and creates a substantial risk of serious harm, will support an adjudication that a child is abused. R.C. 2919.22(B)(3). "Proper and reasonable" parental discipline "stops well short of corporal punishment which creates a substantial risk of serious physical harm to a child." State v. Hicks (1993), 88 Ohio App.3d 515,519.
 {¶ 68} Further, "[a]s the Revised Code does not specifically define what actions constitute abuse of a child, the trial court is to make its determination on a case-by-case basis, reviewing the totality of the circumstances." In the Matter of Wilson Children (Feb. 6, 1995), 5th Dist. No. 1994CA00161; In re Schuerman, supra, at 531. Among the factors to be considered "include the circumstances giving rise to the harm to the child, *Page 25 
the past history of the child, the nature and manner of the discipline administered, and the measure of discipline." In re WilsonChildren, supra; In re Noftz (Aug. 22, 1986), 6th Dist. No. H-85-26.
 {¶ 69} Discipline methods on a child which leave recognizable bruising and cause pain which lasts beyond the time immediately following an altercation between parent and the child may establish a finding of substantial risk of serious harm, i.e., pain and suffering. See In reHorton, 10th Dist. No. 03AP-1181, 2004-Ohio-6249 (circular marks and linear bruising on child's upper left thigh and marks on right forearm, along with testimony established child's pain was of such duration as to result in substantial suffering). R.C. 2919.22(B)(3) requires only that the corporal punishment create a substantial risk, or strongpossibility, that such pain and suffering will occur.
 {¶ 70} We also note that R.C. 2919.22 addresses the crime of child endangering. The language used to define what constitutes a misuse of corporal punishment was written primarily for the purpose of convicting a person of the offense of child endangering. A criminal conviction for a violation of the endangering children statute is not, however, a prerequisite for a juvenile court to find that a child is an abused child pursuant to R.C. 2151.031(D). Consequently, even if the corporal punishment administered does not result in a child endangering charge or conviction, it does not mean that the conduct has not caused the child to suffer "physical or mental injury that harms or threatens to harm the child's health or welfare." *Page 26 
 {¶ 71} In this case, the trial court's determination regarding the allegations depended on the credibility of the witnesses and evidence. Testimony was presented from the children that in disciplining his daughter, father used a rubber "car part" to strike Kristen on the buttocks. This "discipline" was administered either for taking and eating food in her bedroom without permission or for the more serious offense of stealing a cell phone from a family friend. Father admitted spanking the child, but denied using any object other than his hand. Photo evidence shows bruising on the buttocks which are consistent with a linear object striking several places horizontally across both cheeks. All four children stated that they had been told that if they reported abuse, they would be taken deep into a nearby woods and either left or killed, and no one would ever find them.
 {¶ 72} Father's and stepmother's primary defense consisted of attempting to discredit Kristen and the other children's version of the incident and family life. The parents cited Kristen's prior "bad" behavior and unruliness, painted her and her sisters as chronic liars, and said that Kristen was motivated to lie because all three girls wanted to live with their mother instead of appellant and his wife.
 {¶ 73} The trial court specifically found that there was "no question" that father disciplined Kristen by using corporal punishment and that, "by clear and convincing evidence, that the object used for said discipline was Exhibit B," the rubber car part. The court further stated that: *Page 27 
 {¶ 74} "the bruising of the child's chest and buttocks appears to correspond with the shape of the car part. The Court further finds that the pain experienced by the child was unbearable in light of the pictures evidencing the bruising. Further, the family members described the screams of the child emanating from the bedroom.
 {¶ 75} "There is a history of excessive discipline of the children by Mr. and Mrs. [V.] Each of the children spoke of duct-taped boards, a board with strings, and a dice game that the children were forced to play in determining the number of strikes they would receive. The [V.] children were previously removed from the custody of [father] in 2002 for excessive punishment resulting in bruises. * * * Finally, notwithstanding the intention of the statements made, the children appear to believe father's threats that he will take them to a remote location and leave them. Testimony was elicited that the children are not allowed to use the telephone. They must seek permission for food, and they are grounded for extensive periods of time. * * *"
 {¶ 76} In other words, despite denials and alternate theories or explanations offered by father and his wife, the court found the children's statements about discipline methods and acts, along with the testimony of the counselors, caseworker, CAS A, and GAL, to be credible. As we noted, this court will defer to the trial court's factual findings, if supported by competent, credible evidence. Thus, we conclude that competent, credible evidence was presented which supports the trial court's findings that the use of the rubber car part to strike Kristen was excessive under the circumstances and created a substantial risk of serious physical harm to her. *Page 28 
 {¶ 77} Appellant suggests that merely because a parent may still use "corporal punishment" on a child, appellant's actions did not constitute abuse. The court did not find that father had simply spanked his child with his hand. Rather, the court found that appellant had hit his child with a rubber car part hard enough to leave bruises. We decline to agree that the same conduct which would constitute felonious assault if inflicted on another adult, should be deemed acceptable and non-abusive conduct to "discipline" a child.
 {¶ 78} We find nothing in the law that requires a court to find that physical beatings with any object that result in bruising are acceptable conduct under the guise of parental "discipline." Certainly, if such punishment appears to be a parent's only option for dealing with a child's misdeeds, then that child and family need intense psychological treatment, mental health therapy, or even court intervention, outside the family setting. Therefore, we conclude that the trial court's conclusion that Kristen was an abused child was not against the manifest weight of the evidence.
 {¶ 79} Accordingly, appellant's third assignment of error is not well-taken.
 {¶ 80} The judgment of the Ottawa County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
 JUDGMENT AFFIRMED. *Page 29 
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
Mark L. Pietrykowski, P.J., Arlene Singer, J., William J. Skow, J., Concur.
[1] Although the computer "cut-and-paste" method of brief writing by utilizing briefs written for prior appeals may seem efficient, the potentially fatal typographical error in counsel's third assignment of error illustrates the virtue and necessity of good proofreading. In the interest of justice, however, we will construe appellant's assignment of error to read "abuse" regarding the findings about the incidents with Kristen. *Page 1