[Cite as *In re B.S.*, 2020-Ohio-6775.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

In re B.S.

Court of Appeals No. E-19-052

Trial Court No. 2019-JN-0030

**<u>DECISION AND JUDGMENT</u>**

Decided:  December 18, 2020

* * * * *

Brent L. English, for appellant.

Kevin J. Baxter, Erie County Prosecuting Attorney, and
Kristin R. Palmer, Assistant Prosecuting Attorney, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, N.S. ("father"), appeals the September 3, 2019 judgment of the Erie County Court of Common Pleas, Juvenile Division, awarding temporary custody of his child, B.S. ("the child"), to the child's paternal aunt, T.S. ("aunt"), and granting appellee, Erie County Job and Family Services ("JFS"), protective supervision over the

child following the trial court's June 20, 2019 adjudication of the child as dependent. The child's mother, J.B. ("mother"), is not a party to this appeal. For the following reasons, we affirm.

## I. Background

{¶ 2} JFS initiated an investigation in this case on March 15, 2019, after receiving a referral from the child's daycare regarding unexplained bruising on the child's face, neck, and ears. That day, Amanda Turner, the JFS intake investigator assigned to the case, implemented a voluntary safety plan that placed the child in aunt's custody and allowed mother and father supervised visitation.

{¶ 3} Over the next few weeks, Turner conducted her investigation in the case, which included reporting the child's injuries to the Erie County Sheriff's Department ("ECSD"). An ECSD detective interviewed father, but did not file criminal charges related to the marks on the child. At JFS's request, the ECSD offered to administer a computerized voice stress analysis ("CVSA") to father. Father initially agreed to the CVSA, but upon consulting counsel, changed his mind and refused the test.

{¶ 4} Also on the advice of counsel, on May 2, 2019, father informed Turner that he was terminating the safety plan, 48 days after it was initiated.

{¶ 5} The next day, on May 3, 2019, JFS filed a complaint alleging that the child was neglected and dependent. Specifically, the complaint alleged that on March 15, 2019, the child had "bruising on the inside of his ear cartilage, blood on the inside of both ears, bruising behind one of his ears, a bruise on his cheek, a scratch on his temple beside

2.

his eye, and petechiae bruising on his neck." Although the bruise on the child's cheek and the scratch on his temple were the results of earlier accidents—the child bruised his cheek by pulling a chair over on himself and cut his temple by running into a metal chair—neither father, mother (who had nearly equal parenting time with the child, despite father being the child's legal custodian), nor mother's boyfriend could explain the remaining injuries. The complaint also noted that the child had unexplained injuries in January 2019, including a burn mark on his neck, and bruising on his arms, back, sides, and neck. Along with those injuries, the child had "significant bruising to [the child's] buttock * * *," which mother admitted to causing, although she denied causing any of the other bruising or the burn mark. Father did not report the incident to JFS or police and allowed mother to continue having unsupervised visits with the child. JFS further alleged in its complaint that when father ended the safety plan on May 2, it still had concerns about the child's safety because it did not know how the child was injured in January or March of 2019.

{¶ 6} In addition to the negligence and dependency allegations, JFS sought emergency temporary custody of the child. On May 3, 2019, the trial court held a custody hearing, after which it granted JFS's motion and awarded emergency temporary custody of the child to aunt, with JFS retaining protective supervision over the child. Father and mother were allowed agency-supervised visitation with the child.

{¶ 7} On May 30, 2019, JFS filed a case plan that required father to complete a mental health evaluation and follow any resulting recommendations, complete an anger

3.

management assessment and follow any resulting recommendations, sign any releases of information required for the agency to obtain progress reports from his treatment providers, and cooperate with announced and unannounced home visits.

{¶ 8} On June 17, 2019, the trial court held an adjudication hearing on JFS's complaint. After JFS presented its case, father moved to dismiss the complaint because JFS had failed to prove that the child was neglected or dependent. The trial court granted the motion as to the neglect charge, but denied it as to the dependency charge. After father presented his evidence, the court determined that the child was dependent, continued custody with aunt and protective supervision with JFS, continued supervised visits for father and mother, and appointed a guardian ad litem ("GAL") for the child. On June 21, 2019, the trial court filed a judgment entry reflecting its findings from the hearing. On June 28, 2019, following father's timely request, the trial court also filed its findings of fact and conclusions of law from the adjudication hearing.

{¶ 9} On August 28, 2019, the trial court held the disposition hearing where it heard testimony from the investigation supervisor at JFS, the ongoing case supervisor at JFS, the family's ongoing caseworker, father, aunt, and the GAL. On September 3, 2019, the court issued its judgment entry on the dispositional hearing.

{¶ 10} Father now appeals, raising three assignments of error:

> 1. The trial court's judgment finding B.S. to be a dependent child was not supported by sufficient evidence.

4.

2. The trial court's judgment finding B.S. to be a dependent child was against the manifest weight of the evidence.

3. The trial court's determination that Erie County Department of Job and Family Services sustained its burden of proof that it made reasonable efforts not to remove B.S. from his father's home was against the manifest weight of the evidence.

## II. Facts

### A. Adjudication

{¶ 11} The relevant facts were primarily presented at the June 17, 2019 adjudication hearing. JFS presented the testimony of Turner and Susan Morgan, the administrator of the child's daycare center. Father presented the testimony of aunt and testified in his own behalf. The following facts were elicited at the hearing.

### 1. JFS's case

{¶ 12} Morgan, a long-time employee of the daycare,[1] testified that she and another employee noticed "alarming" marks on the child when he came to the center on March 14, 2018. Morgan completed a "Child Observation Form" to document the marks. Under the section for "Skin," Morgan marked the check box for "Rash" and wrote in the blank for "Location" that it was "around neck." She went on to describe the "Rash" as "ligature mark around neck[.]" She also marked the check box for "Bruises" and

---

[1] Morgan became the daycare's administrator in October 2019.

described the bruising as "small, purple bruise on cheek[,] both inner ears / cartilage / and outer ears – visible trauma to both ears / and behind left ear."

{¶ 13} Morgan also wrote a narrative account of events for the child's file. According to her handwritten notes, she observed:

- ligature marks all around [the child's] neck

- blood behind left ear

- scratch on right temple

- bruise under chin on right side

- post traumatic [sic] bleeds in both ears

Morgan said that the injuries she listed in her notes corresponded with the injuries she saw in the pictures of the child's face, neck, and ears that she took on March 14, and that JFS admitted into evidence. She clarified that the blood behind the child's left ear was dried blood and that the "post traumatic [sic] bleeds" in his ears were bruises, not wounds that "ooze[d]" or "seep[ed]." Morgan also noticed a streak of blood on the left shoulder of the child's shirt in one of the pictures. Based on her training in child-abuse recognition, Morgan believed that someone might have inflicted the injuries on the child because of "[t]he continuation of the ligature mark around his neck" and "the bruising of the interior of his ears."

{¶ 14} Morgan testified that the child did not indicate that he was in pain while she was taking the pictures and that she did not notice him tugging on his ears during the day on March 14. She also said that nothing happened to the child at the daycare that

6.

morning that could have caused the marks that she saw. But on cross-examination, Morgan explained that she only provided direct care in the toddler room, which included an average of seven children, for a few hours that day, some of which was lunchtime and naptime. She also agreed with counsel that she was not "paying particular attention to" the child and that she did not "know whether he had his hands in his ears or not."

{¶ 15} Also according to Morgan's notes, she called father to discuss the marks. Father told her that the child had been with mother until the night before and said that he had not noticed the marks. Morgan sent father the pictures that she had taken of the child's face and neck. After reviewing the pictures, father again said that he had not noticed any of the marks, but said that he would ask mother about them.

{¶ 16} Morgan further noted that she met father when he arrived at the center to pick up the child that afternoon, and he again told her that he did not know how the child got the marks, but speculated that they might have been caused by the child's older half-brother while the child was at mother's house. Morgan and another employee attempted to ask the child what had happened, but because the child was "not a (well developed) fluent child," they were unable to get a response. Morgan noted that father also "tried" to ask the child "who did that to him," but did not note the child's response. According to father, the child said, "Bubby did it." Bubby is the nickname of the child's older half-brother.

7.

{¶ 17} Morgan's notes concluded with a note from the next day, March 15, 2019, that she asked father if he had any more information, to which father responded, "'no, [the child's] mom is denying that anything happened at her house.'"

{¶ 18} Morgan decided to report the child's injuries to JFS because of the "ligature mark all around his neck." She did not make her report immediately because she believed that she had 24 hours to report any suspected child abuse, but testified that she "got in trouble" from the state for not correctly reporting the incident. Other than being "a little" concerned that father did not notice the marks on the child on March 14, Morgan never saw or heard father do anything inappropriate with the child or that caused her any other concerns.

{¶ 19} On cross-examination, Morgan admitted that she did not have any medical training and that she used the term "ligature mark" even though she did not know whether anything had ever been wrapped around the child's neck and used the term "post traumatic [sic] bleed" even though she did not have any evidence that anyone traumatized the child's ears. She was also unaware of whether the child had ear tubes implanted or had an active ear infection, and conceded that middle ear infections could damage the eardrum, which, in turn, could result in bleeding. She also conceded that a child putting his fingers in his ears could cause bruises on the inside part of the ear, and that the blood behind the child's ear could have gotten there from the child rubbing behind his ear when he had blood on his fingers. Morgan also admitted that one spot inside the child's right ear could have been a birthmark, although Morgan interpreted it as "a bleed." Regarding

8.

the marks on the child's neck, in at least one picture, Morgan agreed with father's counsel that the marks looked like a rash, and she acknowledged that the child's enrollment paperwork noted that the child has "[h]ighly sensitive skin and developes [sic] rashes easily." In short, Morgan agreed with counsel that she had "no medical basis to conclude that these injuries were caused by some human being deliberately hurting this child * * *[.]"

{¶ 20} However, on redirect examination, Morgan explained that the pictures did not show the marks as clearly as she had seen them on March 14, and, although father was very concerned about the child, he did not offer her any explanations—such as sensitive skin or an ear infection—for the cause of the marks. Morgan also explained that the marks on the child's neck were flat, and, in her experience, rashes tended to be raised. She said that she marked the check box for "Rash" on the child observation form because "'Rash' was just like more than one spot. I was—it was lots of marks."

{¶ 21} Turner, the JFS intake investigator assigned to the case, also testified. When she went to the daycare center on March 15 to investigate Morgan's report of the child's injuries, Turner saw that the child had "a scratch on his temple, he had a mark by his right eye, he had some bruising and dried blood in his one ear, he had bruising behind his other ear, and he had petechiae bruising around his neck." She described the bruising on the child's neck as "stippled bruising. Sometimes it looks like a rash, but it is distinctively different than a rash. * * * Rashes are generally raised bumps or areas; the petechiae bruising is not raised." Based on her training in identifying child abuse, Turner

9.

said that bruises on a child's ears, neck, or stomach—areas that a child would not normally hit or run into things with—were concerning to the agency.

{¶ 22} Regarding the marks in the child's ears, Turner admitted that she was not aware when she began her investigation that the child had a history of ear infections, had tubes in his ears, or had an active infection in his left ear, the ear in which she believed that she saw blood. Turner was unable to tell whether the substance shown in one picture of the child's left ear was discharge from the ear infection or wax buildup. However, she spoke with mother about the child's history of ear infections, and mother said that the child typically experienced yellowish discharge that did not have any blood in it. Turner also said that she had never seen bruising caused by an ear infection, and did not believe that one of the marks in the child's left ear looked like a birthmark rather than a bruise. Turner did not believe that any of the marks could be explained by an ear infection.

{¶ 23} Turner spoke to father about the marks on the child on March 15. When she first spoke to him by phone, he said that he had gotten the child back from mother on the night of March 13, and, although father had changed the child's clothes the morning of March 14, he had not noticed any of the marks on the child's body. Father did not provide Turner with explanations for any of the child's injuries—including the scratch on his temple and the bruise on his cheek—or speculate about what might have caused the marks.

{¶ 24} After seeing the photographs of the marks on the child, examining the child at the daycare, speaking to Morgan, and discussing the case with her supervisor, Turner

10.

decided to implement a safety plan because of the lack of explanation for the bruising on the child's head and neck. After making this decision, Turner spoke to father on the phone. Father told her that he was on his way to the daycare to pick up the child, and Turner asked him if he could contact someone else to get the child because JFS wanted to implement the safety plan. Although Turner explained to father that a safety plan is "voluntary," she also explained to him that "the other option, if he did not agree, would be that [JFS] would have to file for custody" of the child. Father asked aunt to get the child, and JFS agreed to allow her to take temporary custody of the child. The safety plan allowed father and mother to visit the child as long as aunt supervised the visitation.

{¶ 25} Turner explained that she had between 45 and 60 days to complete her investigation in this case. She interviewed father about the marks on the child, and father verified for Turner that the scratch on the child's temple and the bruise on his cheek were caused by accidents, not by acts attributable to either parent. In the course of Turner's investigation, father also reported that the child was injured by mother in January 2019. Those injuries included "bruising on his buttocks, his side, a little bit on his back. He had petechiae bruising similar to the bruising that he had in March on his neck, and he had some marks on his arms."[2] Mother admitted to "having whooped" the child and believed that was the cause of the bruising on his buttocks, but Turner said that the parents did not

_____

[2] Although Turner described the January bruising on the child's neck as similar to the March bruising on the child's neck, the photographs of the January bruises confirm that they are dissimilar in appearance.

11.

provide explanations for the other bruises. Turner expressed concern that father did not report the child's January 2019 injuries to JFS or any law enforcement agencies until the March 2019 JFS investigation occurred, but conceded on cross-examination that father was not legally required to report those injuries and that father reported to her that he had taken steps to keep the child away from mother for a period of time while he addressed the issue with mother.

{¶ 26} Turner said that any time JFS has a child with physical injuries, it reports the case to local law enforcement, which is how the ECSD became involved in the case. According to Turner, father agreed at a "team decision-making meeting" to take a CVSA—which Turner described as a "voice stress analysis test"—administered through the ECSD, and, if the results were "favorable" to father, JFS "could have looked at ending his portion of the safety plan and returning [the child] to his care." Turner said it was standard practice at JFS to ask parents to take a CVSA if the agency could not determine how a child was injured. However, father was under no obligation to take the CVSA, and after consulting counsel, he chose not to take the test. Instead, on May 2, father left Turner a voicemail message that he was ending the safety plan. Turner agreed that it was father's "right" to end the safety plan because "[i]t's a voluntary safety plan."

{¶ 27} At the time she received father's voicemail, Turner claimed that her investigation was still incomplete because she was still "[w]orking with the family and working with law enforcement." However, she said that she had interviewed father and mother several times and conceded that there was not "any more interacting with the

parents that [she] needed to do * * *." Regarding working with law enforcement, Turner said that the only parts of her investigation that remained incomplete were the CVSA for father and asking the police department where mother and her boyfriend lived to administer CVSAs on them. According to a case note that Turner wrote on May 2, she spoke with father prior to him terminating the safety plan that day to ask about his reluctance to do the CVSA. Turner wrote that "if [father] were to do [the CVSA], and it comes back with no deception, they could end the safety plan." Regardless of what Turner typed in her note, she testified that she does not have the final authority to end a safety plan; that decision must be made in conjunction with a supervisor.

{¶ 28} Father maintained throughout the course of Turner's investigation that he did not cause the marks on the child's body. Turner testified that her investigation "found no explanation as to how the child got marks and bruises," and she agreed with father's counsel's assessment that "because you weren't satisfied that an explanation was given to you, you determined that this was potentially child abuse[.]" So, because she was not finished with her investigation and had not found a satisfactory explanation for the marks on the child when father ended the safety plan, Turner consulted with the deputy director of JFS for advice on how to proceed. The agency decided to file for emergency temporary custody of the child "due to the fact that [the child] had injuries that we had no explanation for." Turner also testified that the safety plan father signed advised him that "court involvement" was a possibility if he failed to abide by or chose to end the voluntary plan.

13.

## 2. Father's motion to dismiss

{¶ 29} After JFS presented its witnesses, father moved to dismiss the complaint because JFS had failed to show by clear and convincing evidence that the child was neglected or dependent. The trial court granted the motion as to the charge of neglect because the evidence JFS presented showed parental "nonfeasance as opposed to malfeasance" and "a lack of the appreciation of the condition of [the child] and any reaction to that condition * * *," which was insufficient to meet the requirement under R.C. 2151.03(A)(2) that the child lacks adequate parental care because of the fault of the parents. However, the court determined that the agency had shown that the child's condition or environment justified the state, in the interests of the child, assuming guardianship of the child, as required by R.C. 2151.04(C). As the court put it, "when I consider the evidence, again, in the light most favorable to the State, I have to say that very clearly and convincingly, if you will, that the Court's concerned. The Court's concerned about [the child's] condition, concerned about the lack of really much of an explanation as to why that condition is." Accordingly, the court denied father's motion as to the dependency charge.

## 3. Father's case

{¶ 30} Following JFS's case, father presented his witnesses. First, aunt—who is father's sister-in-law—testified that she had been caring for the child since March 15, 2019. She described him as a "normal three-year-old; spunky, rotten, good." She noticed

the marks on the child when she picked him up from daycare that day. According to aunt, the marks on the child's neck and ears all faded within approximately one week.

{¶ 31} Aunt did not initially notice that the child had an ear infection, but the next day, she noticed green drainage from the child's left ear, he was crying and saying that his ear hurt, and the tube implanted in his left ear fell out. The drainage did not have any blood in it. Aunt took the child to the emergency room, where he was diagnosed with an ear infection and given antibiotics. Aunt did not ask the emergency room doctor to examine any of the other marks on the child, and the medical records from the visit do not mention the marks. No one from JFS discussed the child's ear infection with aunt.

{¶ 32} Aunt had never seen father be physically aggressive or abusive toward the child or administer inappropriate discipline. When father's attorney asked aunt if she had any concerns about father's ability to properly parent the child, she responded, "other than the marks, I don't have any concern, no, because, like, I don't know where they came from." When aunt spoke to father on the phone on March 15, he told her that he did not know how the child got the marks. Aunt also knew that mother denied causing the marks on the child, but had speculated that the child's older half-brother might have caused some of the marks. Aunt did not have any personal knowledge about where the marks came from.

{¶ 33} Finally, father testified in his own behalf. Father was granted legal custody of the child in April 2017, but mother and father each had possession of the child approximately 50 percent of the time.

15.

**{¶ 34}** Father said that he got the child from mother around 4:30 p.m. on March 13, 2019.  At that time, he did not notice any marks on the child other than the scratch on his right temple and the bruise on his left cheek, which resulted from earlier accidents during mother's parenting time.  The bruise happened a week earlier when the child pulled a chair over onto himself at mother's house.  The scratch resulted from the child running into the corner of a chair at a babysitter's house and cutting his temple two weeks earlier.  Although the cut on the child's temple happened during mother's parenting time, father picked the child up from the babysitter's and had a friend who is a nurse examine the cut to see if the child needed stitches.  The friend determined that the child did not need stitches, put sterile strip bandages on the cut, monitored him for two hours, and concluded that "'He'll be fine.'"

**{¶ 35}** After getting the child, father, the child, and another of father's children went to a friend's house where they stayed until 9:00 p.m.  When they came home, father put the children to bed.  The next morning, father overslept, so he was rushing to get the children to daycare.  He did not bathe the child the evening of March 13 or the morning of March 14 and very quickly dressed the child the morning of March 14, so he did not get a good look at the child's body.  Father did not notice any issues with the child's ears, either; the child was not complaining of pain, and father did not see any discharge.  When father dropped the child off at daycare, the child began crying, which father said was unusual, although the child would be fussy when he was developing ear infections.

16.

{¶ 36} Approximately an hour later, father received a call from Morgan at the daycare asking if he had noticed any marks on the child. When he told her he had not, she offered to send pictures. When father reviewed the pictures, he claimed that he had not seen the marks on the child's neck or any of the marks in or behind his ears before receiving the pictures. Father forwarded the pictures to mother, who also claimed that she had not seen the marks and did not know how the child got them. Mother suggested that they had happened at the daycare.

{¶ 37} When father returned to the daycare that afternoon, he examined the marks on the child's neck and ears. He said that the mark behind the child's left ear was dried blood that he easily wiped away. He then spoke with Morgan and reported that neither he nor mother knew how the child got the marks. At that point, father asked the child "what happened and how did those marks get put there, and he responded, right in front of his day care [sic] provider, 'Bubby did it.'" Father conceded, though, that he did not know whether the child's half-brother actually caused the marks.

{¶ 38} That evening, the child was acting normally and told father "no" when father "asked him if it hurt * * *," so father did not seek any medical attention for the child. Father also asked the child again what had happened. This time, the child responded, "'At mommy's house.'"

{¶ 39} The next morning, on March 15, when father took the child to daycare, Morgan asked if father had learned anything more about how the child had gotten the marks. He told her that he had talked to mother again, who still claimed that she did not

17.

know where the marks had come from and thought that they had happened at the daycare. Morgan told him that "there's no way it could have happened at the day care [sic]." Father also reported the child's statement from the night before that the marks happened "'At mommy's house.'"

{¶ 40} That afternoon, father received a call from Turner inquiring about the marks on the child. He told her that he did not know how the child had gotten the marks and that—with the exception of the mark on the child's temple—he had not seen any of the marks until he received the pictures from Morgan. Father also told Turner about his conversations with Morgan and mother the day before and about the statements the child made to him regarding "Bubby" and "mommy's house."

{¶ 41} Shortly after, as father was driving to the daycare to pick up his children, Turner called him again. According to father, Turner

> had talked to [mother] and neither of us know what happened and
> that I am to—that she was at the school and I am more than welcome to
> come, but that I needed to call somebody else to pick up my children.
>
> * * *
>
> I said "Why both of my children," and she said that I—she said
> because there was marks on [the child] that they didn't have any reason—or
> any explanation where they came from.
>
> And I said, "But that has nothing to do with [father's other child],
> and [father's other child] never had any marks."

18.

She said, "I don't care. They're both in your care. You dropped [the child] off. You need to call somebody else."

I said, "So I cannot even come and pick up my kids?"

She said, "No. You need to call somebody else. It has to be somebody else—" or, "It has to be somebody who can pass a background check or they cannot take your kids as well."

I said, "Okay. Let me see if I can contact somebody."

I said, "Can I ride with them?"

She said, "No. You can meet them here but you cannot ride in the car with them."

Father said that Turner told him someone else had to pick up the children because she was concerned for their safety. During the phone call, Turner did not discuss a safety plan with father.

{¶ 42} After this conversation with Turner, father called aunt to ask if she could pick up the child. When she agreed to do so, father went to the daycare where he spoke with Turner in person.

{¶ 43} Turner first asked who was coming to pick up the child and whether that person would be able to pass a background check. After father provided aunt's details to Turner, Turner again asked what had happened to the child. Father

explained to her again where the marks—both marks, the cut on his forehead and the bruise on his cheek—came from, and that it was not at my house.

* * *

She asked me what had happened with the ear and the neck, and I said "I have no idea."

* * *

And she asked me how I wouldn't know something like that in the morning, and I said I was in a rush. I woke up late, I had to get my kids to school, hurried up, got them undressed, got them dressed, and out the door we went.

{¶ 44} It was at this point that Turner first discussed a safety plan with father. She gave him a document that said the child would be placed in aunt's care and his other child would be returned to her mother's care and that he could only have supervised visitation with each child. He signed the safety plan because Turner "made it sound like that if I didn't agree to her plan, that my kids were going to be taken away from me."

{¶ 45} Father said that he was cooperative and truthful throughout the entire process and spoke with Turner and the ECSD detective each time they requested interviews. He claimed that the issue of the CVSA came up at a meeting that included him, Turner, Turner's supervisor, mother, and mother's boyfriend. According to father, at the meeting, mother's boyfriend "recommended that we all take a lie detector test

because we did not do it." Father initially agreed to the lie detector test because he was willing to "'do whatever I got to do to get this safety plan done and over with so I can get my kids back. My kids are not in harm's way with me.'" JFS agreed to ask the ECSD if it could facilitate a polygraph, but it took several weeks for the detective to contact father. When he did, he told father that he was going to administer a CVSA, which father did not consider equivalent to a polygraph because it was "a stress test, not a lie detector test." After talking to the detective about the CVSA, father consulted with his attorney—who advised him not to take the test—and declined the detective's request that father come to the ECSD for the test. After that, on May 2, Turner called father and told him that if he took the CVSA, JFS would end the safety plan and return the child to father's care. After that conversation, father decided to end the safety plan and took the child home from aunt's house. The next day, JFS filed the complaint and motion for emergency temporary custody.

{¶ 46} Regarding the marks on the child in January 2019, father explained that the child was with mother when the injuries occurred, and father found out about them from the child's babysitter, who sent father pictures of the bruises. Father described them as "marks on his butt from a handprint, he had marks on his side that looked like fingerprints. He had one mark on his back that was old; you could barely see it [and h]e had marks around his neck * * *" that looked like finger marks, and a mark on the back of his neck that looked like a burn. Father went to the babysitter's house and waited for mother to get there. When she did, he asked about the child's injuries, but mother "did

21.

not fess up to it[,]" so father took the child home with him and told mother that she could not have parenting time with the child "'until further notice.'" He let mother call the child and offered mother supervised visits with the child at his house, but mother did not accept the supervised visits. Father did not report the child's injuries to police or JFS "[b]ecause I'm my kid's dad and he was safe with me." Mother eventually told father that she had caused the hand-shaped bruise on the child's buttocks, the finger-shaped bruises on his sides could have come from her trying to hold him down so that he did not slide off of his chair and then holding him up to make him stand in the corner, and the mark on the back of his neck that looked like a burn might have been from the child sliding off of his chair.

{¶ 47} On cross-examination, JFS introduced text messages between father and mother following the January injuries to the child showing that mother provided this explanation for the child's injuries at the time they happened, but father did not believe her. Mother's text messages also noted that she had "busted [the child's] ass WHILE [sic] [she] was on the phone with [father] * * *," that father told her to "whoop his ass good and he wouldn't act like that[,]" and that mother had told father that the child's half-brother "was caught Sunday morning holding a blanket down over [the child]." Although father was unwilling to accept mother's explanation for the child's injuries over text message, he said that he later spoke to mother in person and, following that conversation, he accepted mother's explanation for the injuries and allowed her to resume parenting time with the child. In total, father restricted mother's parenting time for approximately

22.

one week.  Father also talked to mother about not letting injuries like these happen to the child again, and he did not see any other marks or injuries on the child until March. Father did not speak to mother's boyfriend about the incident and could not say one way or the other if the boyfriend had anything to do with the child's January injuries.

{¶ 48} Assuming that the marks inside of the child's ears were bruises, father did not have an explanation for how the bruises might have gotten there.  Father said he was not "in" the child's ears and did not hit him in the head.  However, he said that the child was rambunctious and "pretty accident-prone.  He trips a lot[,]" and that the child and his half-brother "wrestle around and play rough."  He also explained that the child has extremely sensitive skin and chronic ear infections.  After aunt began caring for the child, he was diagnosed with a cyst and a ruptured eardrum in his left ear, which required surgery.  He could not say whether whatever caused the bruising on the child's ears was also responsible for rupturing his eardrum.  The trial court asked father about his understanding of the function of the child's ear tubes and any restrictions on the child's activities because of the tubes.  Father was not the child's legal custodian at the time of the ear-tube surgery, so he did not know every detail about the function and care of the ear tubes.  For example, he knew that the tubes helped with drainage in the child's ear, but he did not know if there were restrictions on the child's activity beyond keeping water out of his ears for a period of time immediately following surgery.  The court's questioning ended with the following exchange:

23.

THE COURT:  * * *

Having heard the testimony and everything, when I see this, I—why didn't it ever occur to you that this had something to do—or these pictures had something to do with his ear problems?  Did you ever tell anybody, "Hey, he's got tubes in his ears and maybe that's got something to do with bruising," or whatever was wrong with his ears?

[FATHER]:  I didn't—it didn't cross my mind.

THE COURT:  It never connected?

[FATHER]:  No.

### 4.  The trial court's decision

{¶ 49} When father rested his case, he again moved for the court to dismiss JFS's complaint.  The court explained that it was only considering whether the child "is a dependent child in whose condition or environment is [sufficient] to warrant the State, in the interest of the child, in assuming the child's guardianship[,]" pursuant to R.C. 2151.04(C).  The court found that JFS had presented clear and convincing evidence that the child was dependent.

{¶ 50} First, the court noted that the child had suffered from frequent ear infections his whole life and had tubes surgically implanted to help with his ear condition, but that father was not "really aware of what conditions [he] needed to be aware of because of those tubes."  In the court's view, considering the evidence in the light most favorable to the parents, it was possible that the condition of the child's ears on

March 14 could have been related to his history of ear infections, and it was also understandable that father might not have noticed the marks on the child's ears the morning of March 14 as he was rushing to get out of the house. However, once father knew of the marks, he did not take the child to the doctor or make anyone inquiring about the marks in the child's ears aware of the child's history of ear issues.

{¶ 51} The court was also concerned that father "stopped short" of responding to mother's inappropriate discipline of the child in January in a way that would ensure the child's safety. The court recognized that father was disturbed by mother's treatment of the child and the injuries she caused, but did not think that "a promise from Mom that it won't happen again" was sufficient to resolve the situation. Father's insufficient response to mother's treatment of the child, combined with the court's belief that the March bruising likely happened at mother's house—although the court could not say who, if anyone, caused the marks or how they happened—led the court to conclude that the child's environment was such that JFS was justified, in the interests of the child, in assuming the child's guardianship. Despite adjudicating the child dependent, the court did not believe that JFS needed to supervise the child's visits with the parents, so the court allowed visits to be supervised by aunt, as they had been under the safety plan.

{¶ 52} On June 20, 2019, the trial court issued its judgment entry adjudicating the child dependent. The court found that it would be contrary to the child's best interest to stay in the home and that JFS made reasonable efforts to prevent the removal of the child from the home, prevent the continued removal of the child from the home, or make it

25.

possible for the child to return home by initiating a safety plan after learning of the marks on the child's ears and neck in March 2019.  After aunt was granted emergency temporary custody of the child, JFS provided case management services, coordinated supervised visits, and had monthly contact with the child and parents.  The court continued temporary custody with aunt and protective supervision with JFS, terminated JFS-supervised visits, and allowed aunt to supervise the parents' visits with the child.

{¶ 53} Father requested findings of fact and conclusions of law, which the trial court filed on June 28, 2019.  The findings of fact generally conform to the testimony as outlined above, although the trial court did not accept father's testimony that the child told him that "Bubby did it" or that the injuries happened "'At mommy's house.'"  The court concluded that the child's environment was such that his interests warranted JFS assuming guardianship of the child because

> [n]either the parents, nor [JFS] offered any explanation on how the injuries to [the child's] neck and ears occurred.  The bruising of both ears and the blood found around them is not the result of a left ear infection.  Father denied (Mother did not testify) that [the child] showed any signs of discomfort in his ears, nor did he observe [the child] pulling on or otherwise touching his ears.  Further, father didn't notice any of the concerning injuries during the time in question.  At best, Father was not attentive to [the child] in supervising and assessing his condition which is

26.

more necessary for a child as young as and as non-communicative as [the child] is.

* * *

* * * [T]he failure of both parents to see, assess, investigate and treat the various injuries to [the child] places him at serious risk of physical harm. Father's lack of knowledge, understanding of and monitoring of [the child's] ear condition, likewise, places the child at risk of physical harm, including but not limited to pain and hearing loss. Further, Mother's lack of appropriate skills to correct a three year old and Father's encouragement of her inappropriate use of discipline places the child at risk of emotional and physical harm. Lastly, Father's decision to resume visits with [the child] and Mother without any conditions (other than details about what happened) after she "whooped" him indicates that he assented to the behaviors of Mother and placed the child at risk of further physical and emotional harm.

{¶ 54} Regarding JFS's reasonable efforts to prevent the continued removal of the child from the home, the court found that JFS tried to resolve the situation through the voluntary safety plan while it investigated, but father unilaterally canceled the safety plan before JFS completed its investigation. The court also found that after filing the complaint and motion for emergency temporary custody, JFS

27.

advocated for and arranged placement with a relative which is least restrictive under the circumstances. However, [the child's] injuries, the parent's [sic] lack of concern or explanation justified [JFS's] actions and limited their ability to return the child to his home before further proceedings and orders can take place. As a result, it would be contrary to the safety, welfare and best interest of the child to continue in the home.

## B. Disposition

{¶ 55} Following the August 28, 2019 dispositional hearing, the trial court issued its dispositional judgment entry on September 3, 2019. The court found that JFS met its statutory duty of maintaining and filing a case plan, and that the concerns and goals JFS identified in the case plan were justified based on

the inappropriate discipline that [the child] endured in January, the lack of explanation of the March injuries, and the lack of detection of the marks by both parents despite the fact they both cared for [the child] shortly before the marks were discovered. Additionally, [JFS] discovered that both parents had prior drug and alcohol issues that resulted in criminal justice intervention * * *. They also pointed to the lack of explanation for the injuries as causing them to have to rule out mental health, anger and substance abuse issues.

Although the court recognized that father had "mounted a vigorous defense at every stage of these proceedings" and that "it appears that Father objects to the case plan in its

entirety[,]" the court determined that proceeding without a case plan "is not an option in this situation, as R.C. §2151.412(A) mandates a case plan." The court approved JFS's proposed case plan, with some amendments, and continued temporary custody with aunt.

{¶ 56} The court determined that JFS made reasonable efforts to return the child to the home "in that the removal occurred under emergency circumstances (at father's unilateral termination of the safety plan); and now the concerns of the mother and the father have not been satisfactorily addressed, as they are both uncooperative and resistant to any activities before the Court orders such." The court also determined that it would be contrary to the child's best interest to continue residing in the home.

{¶ 57} This appeal followed.

## II.  Law and Analysis

### A.  Competent and credible evidence supports the trial court's finding that JFS proved that the child was dependent by clear and convincing evidence.

{¶ 58} In his first assignment of error, father argues that the trial court's finding of dependency is not supported by sufficient evidence because "the trial court cherry-picked testimony and ignored important facts to reach a conclusion that B.S. was a dependent child by sophistry." In his second assignment of error, father argues that the dependency finding is against the manifest weight of the evidence because "[t]he trial court's findings are not consistent with the evidence and grossly misstate what the evidence actually was."

29.

{¶ 59} JFS counters that father minimizes and mischaracterizes the testimony presented at the adjudication hearing. Based on the evidence presented at the hearing, the agency contends, the trial court correctly determined that the child was a dependent child.

### 1. Standard of review

{¶ 60} A trial court's adjudication of a child as dependent must be supported by clear and convincing evidence. R.C. 2151.35(A)(1); Juv.R. 29(E)(4). Proof by clear and convincing evidence requires that the evidence "'produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus. Clear and convincing evidence is a higher degree of proof than preponderance of the evidence, but a lower degree than beyond a reasonable doubt. *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211, ¶ 37 (6th Dist.).

{¶ 61} When an appellate court reviews a trial court's adjudication to determine whether the judgment is supported by clear and convincing evidence, the reviewing court must determine whether the trial court had before it evidence sufficient to satisfy the requisite degree of proof. *Id.* at ¶ 7. That is, we conduct a manifest-weight review to determine whether the agency sustained its burden of producing clear and convincing evidence of dependency as defined by R.C. 2151.04. *In re C.T.*, 6th Dist. Sandusky No. S-18-005, 2018-Ohio-3823, ¶ 53. An appellate court will not reverse a trial court's

30.

adjudication where competent and credible evidence supports the findings of fact and conclusions of law. *Alexander C.* at ¶ 7.

{¶ 62} Our manifest weight analysis is guided by a presumption that the trial court's findings are correct. *In re A.C.*, 6th Dist. Lucas No. L-10-1025, 2010-Ohio-4933, ¶ 40, citing *In re Williams*, 10th Dist. Franklin Nos. 01AP-867 and 01AP-868, 2002-Ohio-2902, ¶ 9. This presumption exists because the trial court is in the best position to evaluate the evidence by viewing the witnesses and observing their demeanor, gestures, and voice inflections. *Id.*, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Thus, a judgment supported by "'some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.'" *In re Kristen V.*, 6th Dist. Ottawa No. OT-07-031, 2008-Ohio-2994, ¶ 65, quoting *Seasons Coal* at 80, and *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 63} As relevant here, a dependent child is a child "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship." R.C. 2151.04(C). Generally speaking, courts apply R.C. 2151.04(C) broadly to protect the health, safety, and welfare of children. *In re L.H.*, 12th Dist. Warren Nos. CA2018-09-106, CA2018-09-109, CA2018-09-110, and CA2018-09-111, 2019-Ohio-2383, ¶ 41. "A finding of dependency under R.C. 2151.04 must be grounded on whether the children are receiving proper care and support; the focus is on the condition of the children." *In re A.B.C.*, 5th Dist. Stark No. 2011 CA 00073,

31.

2011-Ohio-6570, ¶ 15. As such, a dependency finding "requires no showing of fault, but focuses exclusively on the child's situation * * *." *In re Riddle*, 79 Ohio St.3d 259, 262, 680 N.E.2d 1227 (1997). And although the focus of the trial court's analysis is on the child's present condition or environment, "'the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm.'" (Brackets sic.) *A.C.* at ¶ 75, quoting *In re Burchfield*, 51 Ohio App.3d 148, 156, 555 N.E.2d 325 (4th Dist.1988).

{¶ 64} In a dependency case, a trial court may only consider a parent's conduct to the extent that the conduct forms part of the child's environment. *Id.* at ¶ 74. The parent's conduct is significant only if the conduct has an adverse impact on the child sufficient to warrant state intervention. *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). Indeed, "the fact that the physical needs of [the children] were met and that they generally lived in an appropriate home does not automatically lead to the conclusion that they are not dependent under R.C. 2151.04(C)." *L.H.* at ¶ 47, citing *In re Bugaj*, 7th Dist. Belmont Nos. 06-BE-24, 06-BE-25, and 06-BE-26, 2008-Ohio-871, ¶ 32. Unexplained injuries that are atypical of normal childhood injuries can support a finding of dependency. *See A.B.C.* at ¶ 27 (upholding the trial court's finding of dependency when parents did not provide a "viable" explanation for the infant's injuries and no other explanation for the injuries could be determined).

## 2. The trial court's dependency findings

{¶ 65} In this case, the trial court found that JFS proved by clear and convincing evidence that the child was dependent based on his condition or environment. The court relied on (1) "bruises, marks and blood around [the child's] neck, face and ears" that did not appear to be the result of normal childhood activity and that neither parent could explain; (2) the lack of evidence that the marks in both of the child's ears and the dried blood in and around his ears were caused by an infection in his left ear, including father's testimony that the child was not showing any signs of discomfort or pulling at his ears; (3) father's lack of attention to the child's condition, which the court based on father's failure to notice the marks on the child either after getting him back from mother on the afternoon of March 13 or on the morning of March 14, and which the court found was "more necessary for a child as young as and as non-communicative as [the child] is"; (4) father's apparent encouragement of mother's inappropriate discipline of the child, as evidenced in the text messages from January 2019 in which mother wrote that she "busted [the child's] ass WHILE [sic] [she] was on the phone with [father] * * *" and that father told her to "whoop his ass good and he wouldn't act like that"; and (5) father's decision to allow mother to resume unrestricted visits with the child following the January incident, which the court construed as father's assent to mother's behavior. In reaching these conclusions, the trial court specifically found "the testimony and evidence presented to be credible."

33.

{¶ 66} Father takes issue with every single finding the trial court made and claims that it is only because the trial court "cherry-picked testimony and ignored important facts * * *" that it was able to conclude that the child was dependent. We disagree.

### 3. Bruises, marks, and blood around the child's neck and ears

{¶ 67} First, regarding the marks in and around the child's ears and neck, father argues that the photographs of the child that were admitted into evidence at the hearing "clearly show no bruising, or blood * * *." Father is correct that the quality of the photographs makes it difficult to determine whether the marks inside and behind the child's ears are bruises, dried blood, birthmarks, or shadows. However, the marks on the child's neck are clearly identifiable as stippled bruises in the photographs. And the photos are not the only evidence the trial court based its findings on. Morgan, Turner, and aunt each testified that they saw some type of bruising and blood in or around the child's ears and on the child's neck when they observed the child in person.

{¶ 68} For example, Morgan said that the pictures "don't look the same" as the marks she saw on the child on March 14, and that the marks on the child's neck were flush with the skin, not raised, like Morgan would expect a rash to be based on her experience as a childcare provider. Turner testified that she "saw, personally, blood inside of [the child's] ear." She also said that the marks on the child's neck were bruises, not a rash, because they were flat, not raised like rashes are. And aunt said that she saw blood "on the inner part of * * *" the child's left ear when she picked him up from daycare on March 15. Additionally, aunt said that all of the marks on the child went

34.

away within about a week, and she never noticed a birthmark on the inside of the child's ear.

{¶ 69} Bolstering the women's testimony, father testified that there was dried blood behind the child's left ear, and the pictures show streaks of blood on the shoulder of the child's shirt.  We also note that father did not mention in his testimony that the child has a birthmark in his ear.  Additionally, the fact that the trial court used the word "blood" without saying whether it was "fresh" or "dried" is immaterial.

{¶ 70} Based on the testimony presented at the adjudication hearing, we find that there is some competent, credible evidence supporting the trial court's findings regarding the marks on the child's ears and neck, and the trial court did not "grossly overstate[] and unfairly skew[] the evidence," as father claims.

### 4. Father's inattentiveness to the child, failure to "observe, assess, investigate and treat" the child's injuries, and lack of understanding of the child's "ear condition"

{¶ 71} Next, father takes issue with the trial court's conclusions that he was inattentive to the child because he did not notice the marks on the child from approximately 4:30 p.m. on March 13 until Morgan sent him pictures of the marks around 11:00 a.m. on March 14, did not appropriately respond to the marks on the child, and—despite a lack of medical evidence in the record—did not fully understand the child's medical needs relative to his ear tubes.

{¶ 72} We agree with father regarding the trial court's findings about the child's "ear condition."  Although the child has a history of ear infections and has tubes in his

35.

ears, by finding that the marks and blood in the child's ears were not caused by an ear infection (i.e., because the child was not showing signs of discomfort or pulling at or touching his ears), the trial court implicitly found that the child did not have an ear infection (at least not a symptomatic one) on March 14. And there was no evidence that father failed to seek medical attention for any ear infections or other ear issues that the child developed while in father's care.

{¶ 73} The trial court acknowledged that it did not "have the medical evidence to draw where I will say a medical conclusion about * * *" the condition of the child's ears or the onset of an infection, but with the parents' knowledge of the child's history of ear problems and the pictures that showed that "obviously there's something very wrong with his ears[; t]hey were very injured[,]" the court expected father to associate the ear tubes with any injuries to the child's ears and be more proactive about seeking medical advice for anything involving the child's ears. Further, although father was unaware of the precise way the ear tubes worked, he understood that they helped the child's ears drain and knew that the child's ear infections had decreased since the tubes had been placed. Father was unable to recite specific care instructions for the child's ear tubes, but the only evidence of any special care required for ear tubes came from the trial judge discussing his personal experience with having ear tubes as a child, which may or may not be the standard of care for ear tubes today.

{¶ 74} Frankly, there was no evidence in the record connecting the bruising and dried blood in and around the child's ears to his ear tubes or an ear infection, or any

36.

indication that the child's medical needs related to his ears were not being attended to. Accordingly, we conclude that the trial court's findings regarding the child's "ear condition" do not rise to the level of clear and convincing evidence that the child's condition or environment justified the state in assuming guardianship.

{¶ 75} Regardless, the trial court's other findings are supported by competent, credible evidence. Father's arguments regarding his failure to observe or investigate the injuries present on the child's body are based on his belief that there was nothing for him to observe, assess, or investigate because the marks on the child's neck were from a "slight rash" and that "no competent evidence was presented that there was 'blood' in, or on, B.S.'s ears, and the alleged 'bruises' were not obvious (and in one instance, mistaken by Turner and Morgan for a birthmark)." Contrary to father's belief, as previously discussed, there was competent, credible evidence supporting the trial court's findings that the child had bruising on his neck and bruising and blood in and around his ears.

{¶ 76} We also find that the trial court had competent, credible evidence upon which to base its finding that the child's environment warranted state intervention because of father's failure to attend to the child's condition. The child had three clusters of concerning marks on his ears and neck. Morgan—whose testimony the trial court found credible—testified that nothing happened at the daycare the morning of March 14 that might have caused the marks, so the marks either happened while the child was in father's care and he did not notice them, or they happened when the child was in mother's care, and father did not notice them after the child was returned to his care.

37.

Although father testified that he did not bathe the child, the marks were on parts of the child's body that are clearly visible with his clothes on, and father changed the child's clothing at least twice—the night of March 13 at bedtime and the morning of March 14 before taking him to daycare—without observing any marks.

{¶ 77} Standing alone, father's failure to notice the marks on the child would be insufficient to support a finding of dependency, but this was not the only fact supporting the trial court's adjudication. Rather, it was one of several factors that the trial court appropriately took into consideration in reaching its decision.

{¶ 78} Accordingly, based on the testimony presented at the adjudication hearing, we find that there is some competent, credible evidence supporting the trial court's findings regarding father's failure to observe, assess, and attend to the child's condition.

### 5. Inappropriate discipline of the child

{¶ 79} Finally, father objects to the trial court's findings related to mother's inappropriate use of discipline on the child in January 2019 and father's alleged endorsement of mother's disciplinary methods. He claims that the punishment mother inflicted on the child—that resulted in, among other things, finger-shaped bruises on his sides and a hand-shaped bruise on his buttocks—was reasonable corporal punishment, which is a lawful form of parental discipline. He also claims that the trial court's conclusion that he assented to mother's behavior because he allowed mother to resume unrestricted parenting time after the January incident is "illogical."

38.

{¶ 80} The trial court relied on mother's use of inappropriate physical discipline and father's assent to her disciplinary methods to show that the child's environment was placing him at risk of physical and emotional harm. The court had before it evidence that mother "busted [the child's] ass" in January, to the point of leaving bruises on the child's sides and buttocks. Mother also wrote in her text messages that she beat the child while she was on the phone with father and that father "told [her] to whoop [the child's] ass good and he wouldn't act like that." Although father makes much in his brief about the fact that the trial court relied on text messages written by *mother* to find that *father* assented to and encouraged mother's disciplinary methods, father did not deny that he told mother to "whoop [the child's] ass good." Moreover, although mother gave father explanations for some of the bruising on the child's body, she did not or could not explain the bruise on his back that looked older than the other bruising or the finger-shaped bruises on his neck. Despite this, father did not talk to mother's boyfriend about the child's bruises, and, after initially restricting mother's visits for about a week, did not require anything more from mother than a promise that she would not beat the child again.

{¶ 81} However, just two months later, the child again had unexplained bruises on his body. The trial court found this significant. It determined that father's decision not to report mother to law enforcement or JFS and to continue to allow mother unrestricted access to the child after only a brief hiatus, combined with mother's lack of skills for appropriately disciplining a three-year-old, placed the child in an environment where he

was at risk of physical and emotional harm. This conclusion is supported by competent and credible evidence.

{¶ 82} In sum, after carefully reviewing the record, we find that JFS proved that the child was a dependent child under R.C. 2151.04(C) by clear and convincing evidence, and that the trial court's finding of dependency is supported by competent and credible evidence. Accordingly, father's first and second assignments of error are not well-taken.

**B. JFS made reasonable efforts to reunify the family.**

{¶ 83} In his final assignment of error, father argues that the trial court erred by finding that JFS made reasonable efforts to eliminate the continued removal of the child from the home or to make it possible for the child to safely return home. His only complaint in this regard is that JFS failed to act in good faith once he told Turner that he would not take the CVSA because the agency immediately sought emergency custody of the child. JFS counters that the record contains competent, credible evidence that it made reasonable efforts to return the child to the home throughout the course of the case.

{¶ 84} Under R.C. 2151.419(A)(1), at any emergency custody, shelter care, adjudication, or disposition hearing at which the court removes a child from the home or continues the removal of the child from the home, the court is required to determine whether the children services agency that filed the complaint or removed the child from the home "made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." "Reasonable efforts" are "'honest,

40.

purposeful effort[s], free of malice and the design to defraud or to seek an unconscionable advantage.'" *In re S.R.*, 6th Dist. Lucas Nos. L-12-1298 and L-12-1326, 2013-Ohio-2358, ¶ 21, quoting *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011 (12th Dist.1992). "In a reasonable efforts determination, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *Id.* The agency has the burden of proving its reasonable efforts. R.C. 2151.419(A)(1).

{¶ 85} We review the trial court's reasonable-efforts determination under a manifest-weight-of-the-evidence standard. *In re E.H.*, 6th Dist. Ottawa No. OT-15-044, 2016-Ohio-8170, ¶ 23. Accordingly, if there is some competent, credible evidence supporting the trial court's findings, we will not reverse on manifest weight grounds. *Kristen V.*, 6th Dist. Ottawa No. OT-07-031, 2008-Ohio-2994, at ¶ 65.

{¶ 86} Here, the only complaint father has regarding JFS's reasonable efforts is that the agency acted in bad faith by removing the child from the home immediately after father refused to take the CVSA and terminated the safety plan. He claims that Turner did no further investigation after father declined to take the CVSA, and argues that JFS "did not act honestly and in good faith after [father] terminated the safety plan after being totally cooperative with the agency and after it was clear that there was no end in sight unless he waived his constitutional rights and took a CVSA * * *." However, Turner testified at the adjudication hearing that father's refusal to take a CVSA and his termination of the safety plan—which both happened on May 2—left her without "any

41.

time to make further investigations * * *" and that she and her supervisor still had concerns for the child's safety because he had sustained injuries to his neck and ears— places where children do not typically get hurt—that Turner had been unable to find a cause for. As Turner specifically explained, the agency "filed a motion for emergency custody due to the fact that [the child] had injuries that we had no explanation for."

{¶ 87} In its June 20, 2019 judgment entry following the adjudication hearing, the trial court found that JFS made reasonable efforts by implementing a safety plan when it first learned of the child's injuries in March 2019. After the agency became involved with the family, it learned that the child had also been injured in January 2019, so when father terminated the safety plan, JFS sought emergency temporary custody of the child. When the court granted aunt emergency temporary custody of the child, JFS made reasonable efforts by providing case management services, coordinating visitation schedules, and maintaining regular monthly contact with the child and the family.

{¶ 88} The court echoed many of the same reasonable efforts findings in its June 28, 2019 findings of fact and conclusions of law. It noted that JFS implemented a safety plan before filing formal legal proceedings, but that father unilaterally terminated the safety plan before JFS completed its investigation. After filing the complaint, JFS advocated for the child to be placed with aunt, which was the least restrictive placement available under the circumstances. The court also found, however, that the child's "injuries, [and] the parent's [sic] lack of concern or explanation justified [JFS's] actions and limited their ability to return the child to his home before further proceedings and

42.

orders can take place. As a result, it would be contrary to the safety, welfare and best interest of the child to continue in the home."

{¶ 89} Our review of the record convinces us that there is no evidence that JFS acted in bad faith or filed its complaint in neglect and dependency and motion for emergency temporary custody in retaliation for father exercising his right to refuse the CVSA. Rather, the agency did what it thought was best for the child's safety under the circumstances—i.e., that he was returning, unsupervised by an outside adult, to a home environment where he may or may not have recently sustained injuries that were consistent with child abuse. Accordingly, we find that the trial court's reasonable-efforts findings are supported by some competent, credible evidence and are not against the manifest weight of the evidence.

{¶ 90} Father's third assignment of error is not well-taken.

### III. Conclusion

{¶ 91} Based on the foregoing, the September 3, 2019 judgment of the Erie County Court of Common Pleas, Juvenile Division, is affirmed. Father is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

_____
JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, P.J.

_____
JUDGE

CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.