[Cite as *In re G.T.*, 2022-Ohio-595.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: G.T. | : | JUDGES:<br>Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Patricia A. Delaney, J. |
|  | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | Case No. 2021 CA 0065 |
|  | : |  |
|  | : |  |
|  | : | <u>OPINION</u> |

CHARACTER OF PROCEEDING:     Apppeal from the Richland County Court of
                             Common Pleas, Juvenile Division, Case
                             No. 2019-DEP-00028

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      March 1, 2022

APPEARANCES:

For Appellee RCCSB                    For Appellant-Mother

CHRIS ZUERCHER                        DARIN AVERY
Richland County Children's Services   Attorney for Mother
731 Scholl Road                       105 Sturges Avenue
Mansfield, OH 44907                   Mansfield, OH 44903

*Gwin, P.J.*

{¶1} Appellant appeals the July 23, 2021 judgment entry of the Richland County Court of Common Pleas, Juvenile Division, overruling her objections, adopting the December 7, 2020 magistrate's decision, and awarding temporary custody of the child to appellee Richland County Children's Services Board ("RCCSB").

*Facts & Procedural History*

{¶2} M.G. is the Mother ("Mother") of G.T., who was born on February 20, 2018. S.T. is the father ("Father") of G.T.

{¶3} On January 29, 2019, RCCSB filed a complaint alleging G.T. was a dependent and abused child. The complaint alleged as follows: G.T. tested positive for illegal substances at birth; both Mother and Father have substance abuse issues; Mother was arrested in July of 2018 for a probation violation; G.T.'s maternal grandparents cared for G.T. while Mother was in jail, and continued to care for him at the time of the filing of the complaint; Father had minimal contact with G.T.; and Mother is not a suitable caregiver due to substance abuse issues, criminal/legal issues, and a lack of parenting skills.

{¶4} On the same day, RCCSB also filed a motion for temporary custody, requesting the court place G.T. in the temporary custody of his maternal grandparents with an order of protective supervision to RCCSB. The trial court granted the motion on February 6, 2019. On February 8, 2019, the trial court appointed Jeanne Pitzer as the guardian ad litem ("GAL") for G.T.

{¶5} The trial court held a second adjudicatory hearing on March 5, 2019, and set a final pre-trial conference for March 19, 2019. Counsel for Mother requested a

continuance of the March 19th date. The hearing was rescheduled to April 2, 2019. At the hearing on April 2, 2019, the parties were unable to reach an agreement. The parties requested a full evidentiary hearing as to whether G.T. was a dependent and/or abused child, which the trial court set for May 7, 2019. The judgment entry issued after the April hearing states, "[Father], with representation of counsel and under oath, and [Mother], through counsel, each has waived the timeliness requirements for dispositional hearing of R.C. 2151.35(B) * * * their counsel has assured the Court that he would forthwith supply the Court with written waivers executed by each said parent." Both Mother and Father executed a "Time Waiver (Ohio Juvenile Rule 34(A) & O.R.C. 2151.35(B)(1))" that was filed with the trial court on April 17, 2019.

{¶6} Mother failed to appear for the May 7, 2019 hearing. At the hearing, RCCSB orally withdrew the abuse allegations. Father appeared at the hearing, waived his trial rights, and agreed G.T. was a dependent child. Mother's counsel did not object on her behalf. The trial court found by clear and convincing evidence that, based upon the agreement of Father, lack of objection by Mother's counsel, and the recommendation of RCCSB, G.T. is a dependent child pursuant to R.C. 2151.04(C). Father additionally agreed that it is in the best interest of G.T. to be placed in the temporary custody of his maternal grandparents. The trial court stated, "based on the agreement of Father, the testimony of Father to Mother's medical condition, lack of objection by Mother's counsel, and the recommendation of Children's Services, this Court finds by a preponderance of the evidence that it serves the child's best interests to be placed in the temporary custody of maternal grandfather * * * and to grant an order of protective supervision to children's services." The trial court also found RCCSB made reasonable efforts to prevent the

continued removal of the child from the home through case planning, case management, and regular contact with the child, Mother, Father, and caregivers.

{¶7} The magistrate issued a decision on May 20, 2019, finding G.T. is a dependent child; placing G.T. in the temporary custody of Maternal Grandfather; and granting an order of protective supervision to RCCSB. On June 6, 2019, the trial court entered a judgment entry affirming and adopting the magistrate's May 20th decision.

{¶8} The trial court held a review hearing on August 2, 2019. Mother did not appear at the hearing. The trial court continued the temporary placement with maternal grandparents and continued the order of protective supervision to RCCSB. The trial court held another review hearing on September 20, 2019. Mother did not appear at the hearing. The court continued temporary custody to maternal grandparents and the order of protective supervision to RCCSB.

{¶9} On January 13, 2020, RCCSB filed a motion for disposition, requesting temporary custody to the maternal grandparents be terminated, the order of protective supervision be terminated, and that temporary custody be granted to RCCSB.

{¶10} On January 28, 2020, B.T., the child's paternal grandmother, filed a motion to intervene and motion to modify disposition so that she could be named the legal custodian of G.T. Father filed a motion for legal custody on February 10, 2020.

{¶11} The magistrate held a hearing on February 28, 2020. Mother and Father did not appear for the hearing. The magistrate denied B.T.'s motion to intervene, finding she was not in loco parentis with G.T. B.T. filed objections to the magistrate's order. B.T. filed a second motion for disposition on March 12, 2020, requesting she be named the legal custodian of G.T. The trial court denied both of B.T.'s motions on June 3, 2020.

B.T. filed another motion for legal custody on October 30, 2020. The trial court denied the motion.

{¶12} Mother filed a motion for disposition and legal custody on March 3, 2020. Mother and Father filed numerous motions regarding visitation. On July 21, 2020, Jeanne Pitzer was appointed as attorney for G.T., and the Freemans' were appointed as guardian ad litem's for G.T.

{¶13} On September 30, 2020, RCCSB filed an "amended motion for disposition," seeking to amend its January 13, 2020 motion for disposition to request that permanent custody of G.T. be granted to RCCSB.

{¶14} The magistrate held a hearing on September 24, September 25, and November 6 of 2020 on the following motions: motion of RCCSB requesting temporary custody to maternal grandparents be terminated, the order of protective supervision be terminated, and temporary custody be granted to RCCSB; Father's motion for legal custody for himself and/or his mother B.T.; Mother's motion for disposition asking the child be returned to her custody; and multiple motions and proposed case plan amendments with regards to visitation.

{¶15} Erika Freds ("Freds") was Mother's counselor at Behavioral Rehabilitation Services in Michigan, where Mother was treated beginning in November of 2019. Mother participated in Smart Recovery, which is an "individualized plan" that is largely self-directed. Mother actively engaged in the program, completed the program, and responded well to therapy. Mother's father, T.G., paid for the rehabilitation program in Michigan. Mother reported to Freds that G.T.'s Father was controlling, that she was the "black sheep" of her own family, and that she had issues with her own father. Freds was

not aware if Mother had a one-on-one counselor as of the date of trial, but she recommended it as part of Mother's treatment plan. Freds did not know that Mother's rehabilitation was court-ordered.

{¶16} Sharon Guzell ("Guzell") owns the sober house Mother resides in. Mother is one of five female residents at the house. Mother has her own bedroom, but utilizes a community bathroom. There is no administrator that lives at the home. Guzell speaks with Mother approximately three to four times per week. Guzell randomly drug tests Mother with instant tests approximately once a month. Guzell testified that Mother, "is on Adderall, which shows up as an amphetamine * * * that is the only thing that she has ever, ever tested for in the drug screening." When asked whether this was an appropriate location for a child to live, Guzell stated, "yes," but, "I wouldn't put a child in sober living probably." After further questioning, Guzell stated she has never had a child at a sober living house, but that the child would be safe in the home.

{¶17} Mother testified she started over-using her medications when she was in her 20's, and she is now 38 years old. Mother is currently on Adderall to lower her heart rate, Zolpidem (Ambien) in order to sleep, and Effexor. She admitted she previously overused Adderall, occasionally buying it on the street when she ran out of her prescription. Mother has been in rehab four times, but believes her most recent stay was successful, whereas the previous ones were not. When asked what the longest period of time was where she was not using street drugs and correctly using her medication, she stated she has been sober and using her mediation properly since November of 2019.

{¶18} Mother met G.T.'s Father at a rehab facility in 2015, and used non-prescription drugs (heroin and methamphetamine) for eight months with him. She then

went to rehab in New Jersey. After she ran away from the rehab in New Jersey, she was drug-free for approximately nine months. Mother stopped using drugs when she was on probation out of Ashland County in 2017 because she was being drug-tested. In March of 2019, she began using drugs again until she went to rehab in November of 2019. Mother admitted to taking drugs while pregnant with G.T. Mother testified she no longer struggles with drug addiction and she is not at risk for falling back into drug abuse.

{¶19} Mother describes her daily treatment as reading and being "mindful." Mother admitted that Freds recommended counseling for her. Mother testified she could not find any available counseling appointments, so she contacted the Complex Post Traumatic Street Foundation, who she believes may help her find a virtual counselor. She contacted the foundation to look for a counselor approximately two weeks before the trial date.

{¶20} Mother has a nervous system disorder called postural orthostatic tachycardia syndrome ("POTS"). This affects her heart rate. Mother denied that her condition makes it difficult to parent. She stated she works 10-13 hours per day, then plays basketball. Mother has been employed since March, working as a receptionist. If she gets custody of G.T., her parents will watch him while she is at work. Since G.T.'s birth, there has never been a time where she has been alone with G.T., and completely responsible for him both physically and financially. However, she now believes she can be a good parent to G.T.

{¶21} Mother has had no recent contact with G.T.'s father, and described him as being abusive and controlling towards her. Mother describes her own father as being

emotionally abusive, psychologically abusive, and manipulative. However, her father paid for her rehab stays and purchased a car for her.

{¶22} On direct examination, Mother testified she was ready to take G.T. full-time, and he would live at the sober house with her. On cross-examination, Mother testified that she did not want G.T. living at the sober house and stated, "I wouldn't want him living in the, in the sober living house." Mother has visited with G.T. several times per week at her parents' house. She admitted there was a time that she did not visit him for approximately a year because she was "not okay."

{¶23} Mother got two OVI's in six years, one in 2015 and one in 2017. After that, Mother was arrested on a possession of methamphetamine charge.

{¶24} When asked why she did not appear at multiple court hearings throughout the case, Mother stated she "was using drugs and I didn't believe that I should fight for my son, because I didn't know if I would be a good mother." However, she now believes it is in G.T.'s best interest for her to have temporary custody of him.

{¶25} T.G. is Mother's father. He is currently retired, but previously worked as a cardiologist. Mother moved in with her parents immediately after G.T.'s birth. G.T. had several issues at birth, including a lactose deficiency and gross motor deficiencies. Approximately four months later, Mother took G.T. and left. Three months later, Mother asked her parents to take care of G.T. because she was sick.

{¶26} T.G. has had custody of G.T. since October of 2018. When asked why he did not file for legal custody of G.T., T.G. testified it has been a very difficult thing for he and his wife to consider, but they are 70 years old, and feel they are too old to care for

G.T. permanently. T.G. wants G.T. to be loved, be without violence, and not be with someone under the influences of drugs or alcohol.

{¶27} Though T.G. could not remember any specific incidents of Mother passing out within the past ten years, he testified Mother had "passing out spells" for a lot of her life. During the past ten years, T.G. has seen Mother experience rapid heartbeat and cognitive dysfunction or "brain fog." When asked if there was any time after G.T. was born that Mother's POTS affected her, T.G. stated "yes," and testified that Mother's doctor said POTS symptoms get worse after delivery of a child. T.G. testified it was obvious very quickly that Mother would not be able to raise G.T., due to both her POTS and her drug use. Mother was awake three to four days in a row, then would crash for two or three days, and frequently she would not act normally. Thus, it was clear that T.G. and his wife "would have to be hyper vigilant watching out for G.T. to make sure that, you know, inadvertently [Mother] wouldn't hurt him." However, Mother was unable to recognize that she couldn't care for G.T. and got very upset when T.G. would make such a suggestion.

{¶28} There was a period of time after T.G. got temporary custody of G.T. where Mother did not visit for over a year. T.G. stated he is not doing any of this to control Mother. Rather, this is all about G.T. and providing him the opportunity to have the best chance he can possibly have at life. T.G. wants to believe that Mother can stay drug-free, but feels it is chance that can't be taken when there is such a young child involved.

{¶29} T.G. was asked whether, given how well Mother is doing right now, it would be in G.T.'s best interest to be with her. T.G. stated that he has seen Mother do well a number of times, coming out of rehab four different times looking good, working, and

being productive.  However, she has relapsed over and over again.  T.G. is specifically concerned about Mother's belief that counseling is not important, despite it being recommended by her rehab facility.  T.G. does not think Mother is currently capable of taking care of a child.

{¶30}  Alexandra Long ("Long") is G.T.'s caseworker at RCCSB.  Mother's initial case plan required her to complete a drug and alcohol assessment and follow all recommendations, follow the terms of her probation, continue AOD treatment, and remain sober.  Long considered the recommendation from Freds to continue counseling as one of the recommendations pursuant to the case plan.  Mother is not in counseling and Mother has not reported to Long that she has reached out to any counselors.  Long does not believe Mother will be able to maintain her sobriety without some sort of counseling and continuing supportive services.  Long does not think Mother sees her drug and drinking problem as an ongoing, daily task that needs to be addressed; rather, Mother views her treatment as completed since she went to a treatment facility.  Long did not offer Mother assistance with rent because Mother never informed Long she needed financial assistance.

{¶31}  Long has visited the sober house where Mother resides.  Long does not believe it is appropriate place for a child to live because there are three other individuals there in various stages of recovery, all utilizing communal restrooms and the main portion of the house.

{¶32}  Long described the reasonable efforts of the agency.  When G.T. was voluntarily placed with his grandparents, the agency insured that visits occurred and made sure there were services in place for contact with the parents to be safe.  Long

made referrals for Mother. Mother never asked Long for any type of financial assistance. The agency has visited G.T. every month since the case was opened. Long kept in monthly contact with Mother, however, there was a period of approximately six months when she could not reach her, despite multiple attempts. Long requested drug screens from Mother throughout the case. Up until recently, Mother refused. The agency also attempted to find other family members to place G.T. with, but did not find another appropriate placement.

{¶33} Long does not believe legal custody to B.T. or temporary custody to Mother is in G.T.'s best interest. Rather, she believes placing G.T. in the temporary custody of RCCSB is in the best interest of G.T. This is due to Long's concerns with Mother's housing situation, her lack of support system, the lack of counseling, and the lack of demonstration of long-term sobriety and ability to care for a young child.

{¶34} Sandi Freeman is the CASA/GAL for G.T. She recommended temporary custody to RCCSB with Mother having visits, but not at the sober living house. Mrs. Freeman has visited Mother at the sober house, and does not feel it is an appropriate place for a child to visit or live due to the environment inside the home with recovering addicts.

{¶35} Gary Freeman is also the CASA/GAL for G.T. During the November portion of the hearing, he reaffirmed it was his Mrs. Freeman's recommendation to place G.T. in the temporary custody of the agency.

{¶36} Chelsea Healey ("Healey") from RCCSB testified at the November portion hearing. She attended a visit between Mother and Long in October of 2020 where Mother inquired about rent assistance, and Long declined rent assistance for Mother. Healey

testified that it would have been a different answer had Mother started her case in a timely manner and had inquired about assistance prior to the September hearing date.

{¶37} B.T. is Father's mother. She testified that Mother and Father were good parents to G.T. when they lived in her home, but admitted that she observed Mother "physically -off-balance" and in "slow motion" several times while taking care of G.T. when he was a baby.

{¶38} The magistrate issued a judgment entry on December 7, 2020. The magistrate initially stated that RCCSB's "amended motion for disposition" filed on September 30, 2020, requesting permanent custody be granted to RCCSB, was not heard at these hearings, and would be set for a separate hearing. RCCSB later withdrew their September 30th motion for permanent custody.

{¶39} The magistrate found RCCSB made reasonable efforts to return G.T. to Mother and/or Father through caseworker counseling, monitoring of the parties' circumstances, referrals to appropriate service providers with regard to substance abuse and lifestyle issues, and support of relative care.

{¶40} The magistrate made detailed findings of fact with regard to Mother, Father, and the child's custodial and placement history. These findings of fact include: from the date of the filing of the complaint, Mother was not hospitalized with "medical problems," but she and Father were living in B.T.'s home regularly consuming heroin and other narcotics; Mother's drug and alcohol abuse has led to frequent entanglement with criminal law and at least four periods of inpatient substance abuse rehabilitation; Mother's first three rehab stays were unsuccessful and she fled programs prior to completion; Mother suffers from a medical issue which interferes with her day-to-day functioning; Mother

takes Adderall for wakefulness and Ambien for sleep; Mother admits to past "overuse" of prescription medications; maternal grandfather has observed concerning events of Mother's "brain fog" events recently while G.T. has been in Mother's care; Mother declined to participate in substance abuse counseling and treatment in 2019; in 2019, Mother was found in possession of methamphetamine and was granted treatment in lieu; Mother's rehab as part of her criminal charge went positively and was she was discharged to a "sober living house" in February of 2020; there is no live-in supervision in the sober living house except for addicts in various stages of recovery; Mother first testified she would consider having G.T. reside in the sober living house with her, but then indicated she would not; Mother has had regular contact with G.T.; Mother obtained employment with the help of a family friend; and B.T. provided the opportunity for Mother and Father to feed their drug habit.

{¶41} The magistrate determined it was not in G.T.'s best interests to return to either of his parents "at this time." As to Mother, the magistrate stated that, because of her history, the court, "cannot yet find that her recovery is successful; however, the signs of recovery are generally positive. However, the Court must weigh her short-term success against her long history of substance abuse and her clear physical challenges and professed, self-diagnosed mental health issues in deciding whether she is the best option" for G.T. Further, the magistrate noted the testimony of maternal grandfather that he wanted G.T. be raised "away from drugs and violence."

{¶42} Based upon the evidence presented and the recommendation of the CASA/GAL, the magistrate found, by a preponderance of the evidence, that custody to Mother, custody to Father, and custody to B.T. was not in G.T.'s best interests. Rather,

it was in the best interest of G.T. that temporary custody be granted to RCCSB. The magistrate thus denied Mother and Father's motions for custody, and granted temporary custody to RCCSB.

{¶43} Mother filed objections to the magistrate's decision on December 18, 2020, arguing: (1) the magistrate erred in finding Mother's medical condition interferes with her day-to-day functioning; (2) the magistrate erred in finding mother takes "Adderall for wakefulness" because all testimony indicated it alleviated her tachycardia and steadied her heart rate; (3) the magistrate erred in finding that "others" observed Mother experiencing medical issues while caring for G.T.; (4) the magistrate erred in finding Mother declined counseling; (5) the magistrate erred in finding B.T. testified as to daily narcotic use by Mother or Father; (6) the magistrate erred in finding RCCSB made reasonable efforts to reunify the child with Mother, as the caseworker refused to help Mother with rent; and (7) the magistrate erred in finding that temporary custody to RCCSB served the child's best interests.

{¶44} The trial court issued a judgment entry on July 23, 2021, overruling Mother's objections, and adopting the December 7, 2020 magistrate's decision. The trial court found as follows: the testimony of B.T. established that Mother's medical condition and drug addiction problem interfered with her day-to-day functioning; from B.T.'s testimony, it was evident that Mother had drug issues on numerous occasions; B.T.'s testimony established that Mother's medical issues prevented her from caring for G.T.; Mother used Adderall to sleep; Mother did not seek counseling or treatment during a portion of the pendency of this action; Mother's living situation was not suitable for the child; the agency

made reasonable efforts to reunify G.T. with Mother; and the magistrate did not commit error in awarding temporary custody to the agency.

{¶45} Mother appeals the July 23, 2021 judgment entry of the Richland County Court of Common Pleas, Juvenile Division, and assigns the following as error:

{¶46} "I. THE COURT ERRED IN FINDING THAT PLACEMENT WITH THE AGENCY SERVED THE CHILD'S BEST INTERESTS.

{¶47} "II. THE COURT ERRED IN FINDING THAT THE AGENCY MADE REASONABLE EFFORTS TO PREVENT THE REMOVAL OF THE CHILD FROM THE CHILD'S HOME, TO ELIMINATE THE CONTINUED REMOVAL OF THE CHILD FROM THE CHILD'S HOME, OR TO MAKE IT POSSIBLE FOR THE CHILD TO RETURN SAFELY HOME.

{¶48} "III. THE COURT ERRED IN GRANTING TEMPORARY CUSTODY OF THE CHILD TO THE AGENCY AND OVERRULING MOTHER'S MOTION TO REUNIFY.

{¶49} "IV. THE TRIAL COURT ERRED IN MAKING NUMEROUS FACTUAL FINDINGS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE."

I. & III.

{¶50} In her first and third assignments of error, Mother argues the trial court committed error in finding that temporary custody to the agency was in the best interest of G.T., and in overruling Mother's motion to reunify.

{¶51} Initially, we note, "[a]n award of temporary custody to a public or private children's services agency is substantially different from an award of permanent custody, where parental rights are terminated." *In re K.A.C.*, 8th Dist. Cuyahoga Nos. 102000, 102002, 102005, 102006, 2015-Ohio-1158. Here, the "parent only loses temporary

custody of a child and retains residual parental rights, privileges, and responsibilities." R.C. 2151.353(A)(3)(c). For this reason, "the juvenile court employs the less restrictive 'preponderance of the evidence' standard in temporary custody cases as opposed to the 'clear and convincing' standard of evidence employed in permanent custody cases." *In re Nice*, 141 Ohio App.3d 445, 751 N.E.2d 552 (2nd Dist. Belmont). "Preponderance of the evidence" means "evidence that is more probable, more persuasive, or of greater probative value." *In re D.P.,* 10th Dist. Franklin No. 05AP-117, 05AP-118, 2005-Ohio-5097.

{¶52} The standard of review for a juvenile court's award of temporary custody is abuse of discretion. *Id.* Abuse of discretion occurs when a trial court acts unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). A juvenile court has broad discretion in the disposition of a dependent child. R.C. 2151.353(A) and Juv.R. 29(D).

{¶53} First, Mother repeats the arguments contained in her second assignment of error concerning the reasonable efforts of the agency dealing with rental assistance and Long not attempting to visit or contact Mother for six months, and argues this was a reason to deny the agency's motion and grant her motion for temporary custody. As detailed below, we find there is competent and credible evidence to support the trial court's determination that the agency made reasonable efforts in this case. Thus, this is not a basis on which the trial court should have denied RCCSB's motion for temporary custody.

{¶54} Next, Mother contends the trial court abused its discretion in denying her motion and in granting RCCSB's motion because Mother could never achieve the long-

term sobriety that Long required in order for her to recommend reunification. Long testified that she felt Mother would need to show sobriety for several years before Long would be comfortable recommending full reunification between Mother and G.T. However, when counsel for Mother suggested this completely precludes reunification, Long responded that Mother has waited until the last-minute to do what she needed to do, rather than working on her case plan when it was established. Long did not testify that she would never recommend Mother reunify with G.T. Rather, she believes that Mother's sobriety is new, particularly in light of her significant history of addiction and abuse of multiple substances, as testified to by both Mother and T.G., and wanted to see more evidence of long-term sobriety. Additionally, Long had concerns other than Mother's sobriety, such as the fact that she never, from G.T.'s birth, was solely financially and physically responsible for him. This is not an award of permanent custody and Mother retains residual parental rights, privileges, and responsibilities. R.C. 2151.353(A)(3)(c).

{¶55} Mother also contends that she has complied with her case plan; thus, she asserts the trial court committed error in denying her motion. We first note there was testimony that Mother has not yet complied with her case plan, as she is not participating in counseling and post-rehab supportive services that Long feels are necessary for Mother's long-term sobriety. Additionally, the successful completion of a case plan is not dispositive on the issue of reunification. *In the Matter of D.H.*, 5th Dist. Richland No. 2021 CA 0053, 2021-Ohio-3984.

{¶56} Finally, Mother contends that temporary custody to RCCSB is not in the best interest of G.T. In choosing among the alternatives the juvenile court has in the disposition of a dependent child, "the best interest of the child is the court's primary

consideration." *In re L.C.*, 2nd Dist. Clark No. 2010 CA 90, 2011-Ohio-2066. The trial court has substantial discretion in weighing the considerations involved in making the determination regarding a child's best interests. *In re K.H.*, 2nd Dist. Clark No. 2009-CA-08, 2010-Ohio-1609.

{¶57} We find the trial court did not abuse its discretion in finding, by a preponderance of the evidence, that it was in the best interest of G.T. to grant temporary custody to RCCSB. There is competent and credible evidence to support the trial court's decision.

{¶58} Since G.T.'s birth, there has never been a time when Mother has been solely responsible for the care of G.T. Mother is recently employed and sober, but this is a new development after she did not work on the case plan for many months. Mother has not yet enrolled in counseling as required by the case plan. There are unresolved questions about Mother's living situation and whether she will engage in the supportive services necessary to remain sober.

{¶59} Long believes placing G.T. in the temporary custody of RCCSB in in the best interest of G.T. due to Long's concerns with Mother's housing situation, her lack of support system, lack of counseling, Mother's current lack of ability to care for G.T. full-time, and the lack of sobriety for a sustained period of time. Similarly, Mr. and Mrs. Freeman, G.T.'s GAL's, believe it is in the best interest of G.T. for RCCSB to be granted temporary custody.

{¶60} When asked whether it was in G.T.'s best interest to be with Mother at this point in time, it was T.G.'s opinion that it was not, as Mother has previously relapsed after

four rehab stays. T.G. does not believe she is currently capable of taking care of a child full-time.

{¶61} Based on the foregoing, we find the trial court had sufficient evidence to determine, by a preponderance of the evidence, that temporary custody to RCCSB was in the best interest of G.T. Further, we find the trial court did not abuse its discretion in awarding temporary custody to RCCSB. Mother's first and third assignments of error are overruled.

II.

{¶62} In her second assignment of error, Mother contends the trial court committed error in finding RCCSB made reasonable efforts to prevent the removal of G.T. from the home, to eliminate the continued removal of the child from the child's home, or to make it possible for G.T. to return safely home.

{¶63} The juvenile court is required to make a determination that the agency has made reasonable efforts to reunify the family at "adjudicatory, emergency, detention, and temporary-disposition hearings, and dispositional hearings for abused, neglected, or dependent children." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816; *In the Matter of L.J.*, 5th Dist. Licking No. 2019 CA 0079, 2019-Ohio-5231.

{¶64} "Reasonable efforts" are "honest, purposeful effort[s], free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 606 N.E.2d 1011 (12th Dist. Butler 1992). In a reasonable efforts determination, the issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent

under the circumstances of the case. *In the Matter of J.H.*, 5th Dist. Guernsey No. 19CA000025, 2019-Ohio-5184.

{¶65} Mother believes RCCSB did not make reasonable efforts for two reasons. First, because the agency did not help Mother with rent when she requested the help. Second, because there was a period of approximately six months when Long did not attempt to contact Mother because she thought she was not on the case plan.

{¶66} As to the testimony about rent, Long testified at the initial hearing that RCCSB never helped Mother with rent because Mother never informed Long she needed financial assistance. At the continued portion of the hearing, Healey testified Mother did ask for assistance with rent in October of 2020, however, it was too late in the process and was only after the temporary custody hearing had already began. Long only denied Mother assistance with rent after Mother told Long that she did not need financial assistance, and Mother only inquired after the temporary hearing had already started, and approximately a year-and-a-half after a case plan was established for Mother. Additionally, Mother had not yet completed the program at the sober house when she inquired about rental assistance, and had not yet looked at homes to rent or buy at the time she made the request.

{¶67} With regards to Long's testimony that she did not contact Mother for a period of months because she thought Mother was not working on the case plan, Long admitted she did not attempt to visit with Mother from November of 2019 to June of 2020 because she did not believe Mother was on the case plan.

{¶68} However, the reason why Long did not know Mother was working on the case plan was because Mother was at a treatment facility in Michigan, and never notified

Long she was at the treatment center. As soon as Long attended a pre-trial at which she found out Mother was on the case plan and in treatment, Long resumed visits with Mother. Long also testified she was out on maternity leave for a few of these months. Thus, there was nothing malicious and no design to defraud Mother or for the agency to gain an unconscionable advantage; rather, there were valid reasons for Long's actions. Additionally, this period of time was soon after a six-month period of time during which Long attempted to contact Mother multiple times, but Mother never responded to her and did not appear for any court proceedings.

{¶69} Long testified to the efforts the agency made. These included: insuring visits occurred with various parties during the time that G.T. was voluntarily placed with his grandparents; putting services in place for G.T.'s contact with his parents to be safe; making referrals for Mother; visiting G.T. every month since the case opened; keeping in monthly contact with Mother, except for the period where Mother would not respond to her and for the period where she thought Mother was not on the case plan; requesting drug screens from Mother that she refused until just prior to the temporary custody hearing; and attempting to find an appropriate family member, other than his maternal grandparents, to place G.T. with. Additionally, the record reflects that RCCSB established a detailed case plan for both parents and held multiple team meetings with the parties involved.

{¶70} We find there is competent and credible evidence to support the trial court's determination that RCCSB's efforts were reasonable and diligent under the circumstances of the case. See *In the Matter of O.W.*, 5th Dist. Stark No. 2021 CA 00091, 2022-Ohio-42; In *re K.R.*, 9th Dist. Summit No. 29815, 2021-Ohio-495; *In re B.S.*, 6th

Dist. Erie No. 19-052, 2020-Ohio-6775. Mother's second assignment of error is overruled.

IV.

{¶71} In Mother's final assignment of error, she argues the trial court erred in making numerous factual findings contrary to the manifest weight of the evidence.

{¶72} When conducting a manifest weight review, this Court "determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶73} Mother first contends the trial court erroneously found that her medical condition, POTS, interfered with her day-to-day functioning. Mother argues B.T.'s testimony was not persuasive, and the letter from Mother's employer demonstrates she does well at her full-time job. We find there is relevant, competent, and credible evidence supporting this finding of fact. T.G. testified that Mother has had "passing out spells" for a lot of her life. During the past ten years, T.G. has seen Mother experience rapid heartbeat and "brain fog." When asked if Mother's POTS affected her as far as G.T.'s needs after he was born, T.G. responded, "yes." T.G. described Mother being awake for three to four days in a row, then crashing for two or three days. He stated that he and his wife had to remain "hypervigilant" to make sure Mother did not inadvertently hurt G.T. B.T. observed Mother "physically off-balance" and in "slow motion" several times while taking care of G.T. when he was a baby.

{¶74} As to Mother's contention that the testimony of B.T. and T.G. was not credible and the letter from her employer should have been given more weight than their

testimony, as an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. *Markel v. Wright*, 5th Dist. Coshocton No. 2013CA0004, 2013-Ohio-5274. A trial court may believe all, part, or none of the testimony of any witness who appears before it. *Rogers v. Hill*, 124 Ohio App.3d 468, 706 N.E.2d 438 (4th Dist. 1998).

{¶75} Similarly, the next factual finding Mother challenges, that the trial court's finding that "mother's medical issues prevented her from caring for the child," is also supported by the above-described testimony of T.G. and B.T.

{¶76} Mother next states the trial court's finding that she "used Adderall to sleep" was false because the testimony was that Adderall stabilized her heart rate. Mother is correct that the testimony indicated Mother used Adderall to stabilize her heart rate and keep her awake, but used Ambien for sleep. The trial court did incorrectly use the drug name "Adderall" instead of "Ambien." However, Mother's own testimony is that she uses a prescription sleep aid. While we agree the court erroneously stated "Adderall" instead of "Ambien," we find this is harmless error. The court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Civil Rule 61; *Sweeney v. Pfan*, 5th Dist. Delaware No. 19 CAG 04 0030, 2019-Ohio-4605. The use of the incorrect name of the medication did not affect Mother's substantial rights.

{¶77} Mother next contends the trial court's finding of fact that "she did not seek counseling or treatment during a portion of the pendency of this action" was against the manifest weight of the evidence. We disagree. There is reliable, competent, and credible evidence that Mother did not seek treatment and/or counseling for a portion of time after the complaint was filed. Long testified that Mother could not be found for numerous months after the complaint was filed. Mother admitted she did not visit with G.T. or start

on the case plan for approximately a year after the case was filed because she was "not okay." Additionally, Mother admitted that, despite the recommendation of Freds, she was not in counseling at the time of the hearing. Both Long and T.G. are concerned about Mother's ability to demonstrate long-term sobriety without counseling and supportive services. Long specifically testified that she does not believe Mother will be able to maintain her sobriety without some sort of counseling and supportive services, and is concerned that Mother does not see her drug and drinking problem as an ongoing task that needs to be continually addressed.

{¶78} While Mother states the trial court's factual finding that "mother was absent from the home of [B.T.] while the child was in her home," is correct, she argues it is not relevant because it was from a time period prior to the filing of the case. However, this finding it not against the manifest weight of the evidence. There is competent and credible evidence to support the factual finding, in the form of B.T.'s testimony.

{¶79} As to the relevancy of the evidence, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. The issue of whether testimony is relevant or irrelevant is best decided by the trial judge, who is in a significantly better position to analyze the impact of the evidence. *State v. Taylor*, 39 Ohio St.3d 162, 529 N.E.2d 1382 (1988). Accordingly, the admission or exclusion of relevant evidence lies within the sound discretion of the trial court. *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 567 N.E.2d 1291 (1991). We find the trial court did not abuse its discretion in admitting this evidence and find it relevant, particularly since it dealt directly with how Mother acted when G.T. was in her custody. As this Court

has previously stated, a parent's history of drug use prior to the filing of a complaint affected the condition or environment of a child, and a trial court is permitted to consider the events that led to the filing of the complaint. *In re A.C.*, 5th Dist. Richland No. 2020 CA 0053, 2021-Ohio-288, *appeal not allowed*, 163 Ohio St.3d 1440, 2021-Ohio-1896, 168 N.E.3d 1199.

{¶80} Finally, Mother contends the trial court's factual finding that "Mother did not have suitable living quarters for the child" was against the manifest weight of the evidence. Mother cites to portions of the testimony of Long and Guzell that the sober living house was not unsafe in support of her argument. However, the balance of their testimony, and the testimony of Mrs. Freeman, is competent and credible evidence of the trial court's factual finding as to the suitability of the sober living home as a home for G.T. Guzell testified that while a child would likely be safe in the home, she "wouldn't put a child in sober living probably" and that she has never had a child in the sober living houses she administers. Mother initially testified that she would bring G.T. to live with her in the sober house, but then testified she would not want him living in the sober house. Long has visited the sober house and testified she does not believe it is appropriate or suitable for a child because there are three other individuals there in various stages of recovery, all utilizing communal restrooms and the main portion of the house. Mrs. Freeman has also visited the sober house, and stated she does not believe the sober house is an appropriate place for G.T. to visit or live.

{¶81} Mother also argues the trial court committed error and its judgment is not supported by Ohio law because the trial court found that a sober living house is "per se unsuitable." However, the trial court made no such finding. The trial court made a factual

finding that was supported by the testimony in this case about the specific sober house that Mother was living in.

{¶82}   Mother's fifth assignment of error is overruled.

{¶83}   Based on the foregoing, Mother's assignments of error are overruled.

{¶84}   The July 23, 2021 judgment entry of the Richland County Court of Common Pleas, Juvenile Division, is affirmed.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur